EAST TENNESSEE, V. & G. R. Co. *v.* PICKERD, Comptroller.[1]

*(Circuit Court, E. D. Tennessee. May, 1885.)*

1. TAXATION — EXEMPTION OF PROPERTY OF CORPORATIONS FROM TAXATION — VALIDITY—IMPAIRMENT OF CONTRACTS.

   Legislatures, unrestrained by some constitutional limitation, have full power to provide, in an act creating a corporation, for an exemption of its property from taxation; and such a provision in the charter of a corporation constitutes a contract which the state may not subsequently impair.

2. SAME—EXEMPTION GRANTED BY REFERENCE TO PRIOR ACTS.

   By its charter and other acts to which it refers, the property of the Cincinnati, Cumberland Gap & Charleston Railroad Company was exempted from taxation; and by force of the legislative and judicial action, detailed in the opinion, said exemption passed with the property and became vested in complainant.

4. SAME—JUDICIAL SALE OF VESTED FRANCHISE.

   The legislature of Tennessee had constitutional authority, after 1870, to provide by law a remedy whereby an outstanding vested franchise, including, among other privileges, an immunity from taxation, could be subjected to a judicial sale for the payment of the just debts of its owner, and for the transfer of the same, in connection with a conveyance of the property, to which it was appurtenant, to a purchaser.

In Equity.

*W. M. Baxter,* for complainant.

*B. J. Lea,* Atty. Gen., for the State.

*Marks & Vertrees,* for defendant.

BAXTER, J. The complainant seeks, by its bill in this case, to enjoin the collection of taxes assessed against that portion of its property formerly belonging to the Cincinnati, Cumberland Gap & Charleston Railroad Company, on the ground that it is exempt from taxation. If the exemption claimed exists, it arises under the legislation and judicial proceedings to be hereinafter referred to and considered. The act of January 27, 1848, entitled "An act to incorporate the East Tennessee & Virginia Railroad Company," exempts all of its property, except slaves, from taxation for 20 years from and after the completion of its road, "and no longer." The act of February 9, 1850, entitled "An act to incorporate the Nashville & Louisville Railroad Company," exempted all of its property from taxation for and during its corporate life.

There is no doubt of the validity of these exemptions. The power of a legislature under our system, when unrestrained by some constitutional limitation, to contract in an act creating a corporation for an exemption of its property from taxation, has been too long established to be now called in question. The supreme court, in the *Binghampton Bridge Case,* 3 Wall. 73, say that the question has been "settled by an unbroken course of decisions," both in the "federal and

[1] Reported by Harper & Blakemore, Esqs., of the Cincinnati bar.

state courts;" that "all courts are estopped from questioning the doctrine;" that "the security of property rests upon it;" and that "a departure from it now would involve dangers to society that cannot be foreseen, shock the sense of justice of the country, unhinge its business interests, and weaken, if it did not destroy, the respect which has always been felt for the judicial department."

In *Humphry* v. *Pegues*, 16 Wall. 249, the same court reiterates the doctrine, and, among other things, say:

"Another question is raised, to-wit, that a legislature does not possess the power to grant to a corporation a perpetual exemption from taxation; that it is not competent for one legislature, by binding another, to compass the death of the state. It is too late to raise this question in this court. It has been held that the legislature has the power to bind the state in relinquishing its power to tax a corporation. It has been held that such a provision in a charter of incorporation constitutes a contract, which the state may not subsequently impair. These doctrines have been reaffirmed and reiterated so recently as 1871, in an opinion of Mr. Justice DAVIS in the case of the *Wilmington R. R.* v. *Reich*, 13 Wall. 264. They must be considered as settled."

These rulings have been adopted and applied in numerous cases in Tennessee. See *Knoxville & O. R. Co.* v. *Hicks*, 9 Baxt. 442.

Assuming under these authorities that the exemptions granted to the East Tennessee & Virginia, and Nashville & Louisville Railroad companies are valid contracts that cannot be impaired by legislation, we will proceed to the next inquiry made necessary by the exigencies of the case, to-wit: Did the Cincinnati, Cumberland Gap & Charleston Railroad Company acquire, under its charter, a like exemption of its property? The act of November 18, 1853, incorporating the Cincinnati, Cumberland Gap & Charleston Railroad Company, among other things, enacted that said "company shall be, and it is hereby, invested with all the rights, powers, and privileges, and subject to all the restrictions and liabilities, of the Nashville & Louisville Railroad Company, except as otherwise provided in this chapter." And the act of December 22d following, entitled "An act to charter the Lexington & Knoxville Railroad Company," further provides "that the Cincinnati, Cumberland Gap & Charleston Railroad Company shall be, and it is hereby, invested with all the rights, powers, and privileges, and subject to all the restrictions and liabilities of the East Tennessee & Virginia Railroad Company, except as otherwise provided in this act and the act this is intended to amend."

The complainant insists that by virtue of the foregoing enactment the Cincinnati, Cumberland Gap & Charleston Railroad Company did, in common with the two companies referred to, acquire an immunity from taxation to the same extent as it had been conferred on said former companies. But this has been expressly denied by the supreme court of this state in two decisions: *Wilson* v. *Gains*, 2 Leg. Rep. 31, and *East Tennessee, V. & G. R. R.* v. *Hamblin Co.*, decided in 1877, but not reported. We have heretofore given our reasons for dissenting from these cases, and subsequent reflection and investiga-

tion have confirmed the conclusions then reached. *Louisville & N. R. Co.* v. *Gains*, 3 FED. REP. 266. In thus dissenting from the ruling of the supreme court of Tennessee, we followed, as we were bound to do, a contrary doctrine announced by the supreme court of the United States. The statute of a state, say this last tribunal, "may make a contract as well by reference to a previous enactment making one, and extending rights to another party." *Binghampton Bridge Case, supra.* Here the power of the legislature to enter into a contract in the way pointed out is affirmed. But the court does not undertake to say in that case that the terms employed in the statutes under which complainant claims, to-wit, "rights, powers, and privileges," are sufficient to invest the Cincinnati, Cumberland Gap & Charleston Railroad Company with the immunity from taxation granted to the two companies to whose charters reference is made. Not at all. But in *Humphreys* v. *Pegues*, 16 Wall. 244, where this precise question arose, the court did so hold.

The pertinent facts of the last case are briefly these: South Carolina in 1851 incorporated a railroad company without exemption from taxation. But in 1855, by an amendatory act, it conferred that privilege. And in 1863, by another act incorporating another and different railroad company, it was provided that "all the rights, powers, and privileges" conferred on the previous corporation should be conferred on the second company. Upon these facts the supreme court held (1) that the property of the second corporation was made, by the act of 1863, exempt from taxation; (2) that the legislature could not, without contravening the national constitution, repeal the act of 1863 so as to subject said last company's property to taxation. And, among other things, the learned justice who delivered the opinion of the court said:

"All the *privileges* as well as the powers and rights of the first corporation were granted to the latter. A more important or more comprehensive privilege than a perpetual exemption from taxation can scarcely be imagined. It contains the essential idea of a peculiar benefit or advantage of a special exemption from a burden falling upon others."

The precise point decided is that the word "privilege" did include the exemption from taxation granted to the former corporation. And although numerous cases have since arisen involving kindred questions which have been elaborately discussed and distinguished from *Humphry* v. *Pegues*, the latter case has been in no way weakened or qualified, but the same has been, by clear implication, several times reaffirmed. Mr. Justice MATTHEWS, in the case of *Tennessee* v. *Whitworth*, 22 FED. REP. 81, said:

"The language of the sixth section (which gave to the Nashville & Decatur Railroad Company all the rights and privileges previously granted to the Nashville & Chattanooga Railroad Company) is precisely equivalent to a declaration that the Nashville & Decatur Railroad Company shall be governed by the charter of the Nashville & Chattanooga Railroad Company, as though it had been re-enacted as such, with the name of the former company in-

serted instead of the latter, repeating in detail the language of each section, granting rights and privileges, and imposing restrictions and liabilities."

These adjudications are conclusive upon this court, and unless there is some fact not yet adverted to that renders them inapplicable, they must control this case.

The defendant insists that the Cincinnati, Cumberland Gap & Charleston Railroad Campany took nothing under that clause of its charter professing to vest it with the rights, powers, and privileges of the Nashville & Louisville Railroad Company. Its contention is that the act to incorporate the last-named company provided that it "should become a law whenever the state of Kentucky may enact the same for the same purpose." No such co-operative legislation has been enacted, and no company has been organized under said act. Upon these conceded facts the complainant insists that said act never took effect or became a law, and that no such corporation as the Nashville & Louisville Railroad Company ever existed; and hence the charter of the Cincinnati, Cumberland Gap & Charleston Railroad Company, professing to vest in the latter company all the rights, powers, and privileges, and onerate it with all the restrictions and liabilities of such non-existing company, passed nothing. It has been so held by one of the circuit judges of the state. Yet, while his judgment was subsequently affirmed both by the state and national supreme courts, neither of them discussed this particular question, nor intimated an opinion in regard to it, unless the solicitude manifested to find other and more plausible grounds upon which to rest their decisions may be regarded as an intimation against the views of the subordinate court. *Railroad Co.* v. *Hamblen Co.* 102 U. S. 273.

This ruling is, in my judgment, manifestly erroneous. The act incorporating the Nashville & Louisville Railroad Company was enacted by the legislature in conformity with the requirements of the constitution. It was duly enrolled, attested by the speakers of both houses, and regularly promulgated and published as one of the statutes of that session. The courts have always taken, whenever it came in question, and still continue to take, judicial notice of its existence and contents. The legislature knew, when it passed the act to incorporate the Cincinnati, Cumberland Gap & Charleston Railroad Company, that no company had been organized under it; and, under the construction contended for by the defendant, the act in question would be converted into a meaningless farce. Such a construction is precluded by every reasonable hypothesis. It is, to my mind, clear that the legislature intended to incorporate the act to charter the Nashville & Louisville Railroad Company in all its details into, and make it a part of, the act to incorporate the Cincinnati, Cumberland Gap & Charleston Railroad Company's charter, and in this way to confer upon and vest in said last-named corporation all the rights, powers, and privileges prescribed therein and granted thereby, including the exemption claimed.

But we need not pursue this discussion any further, as it is not essential to a correct determination of this case.

The act of December 22, 1853, herein previously referred to, also assumes to vest the Cincinnati, Cumberland Gap & Charleston Railroad Company with all the rights, powers, and privileges previously granted to the East Tennessee & Virginia Railroad Company. This company had a lawful existence. Among its rights, powers, and privileges was an immunity from taxation for 20 years from and after the completion of its road. This period has not yet elapsed. If this immunity was vested in the Cincinnati, Cumberland Gap & Charleston Railroad Company, and was subsequently passed to the complainant, it is not important to inquire in this case whether it acquired, in the manner alleged, the rights, powers, and privileges of the Nashville & Louisville Railroad Company or not; for, if the immunity was acquired in virtue of the reference in its charter to the East Tennessee & Virginia Railroad Company's charter, it has not yet expired, and the complainant is entitled to be protected in the enjoyment of its said privilege until it is lost by the lapse of time.

Having shown, as we think, that the Cincinnati, Cumberland Gap & Charleston Railroad Company was by law vested with an immunity from taxation, we will next proceed to inquire whether that immunity has been passed to and invested in the complainant. Ordinarily no such immunity will pass to a purchaser as an incident to the acquisition of the property exempt. *Morgan* v. *Louisiana,* 93 U. S. 217; *Wilson* v. *Gains,* 103 U. S. 417; and *Louisville & N. R. Co.* v. *Palmes,* 109 U. S. 244; S. C. 3 Sup. Ct. Rep. 193. But such an immunity may pass to a purchaser if it is authorized by law. *Memphis R. Co.* v. *Commissioners,* 112 U. S. 617; S. C. 5 Sup. Ct. Rep. 299. So let us see if there was any sufficient authority for the transfer claimed by the complainant in this case.

By the act of February 11, 1852, the legislature of Tennessee projected a general system of railroad improvement for the state. In it the state undertook to aid private enterprise in the building of various railroads, by loaning to the several companies organized for the purpose state bonds, on the conditions therein prescribed. These provisions were precautionary, and were intended to indemnify the state against loss; and, among other reservations of power for the accomplishment of that object, the third section of the act provided "that the state of Tennessee, upon the issuance of said bonds, and by virtue of the same, shall be invested with a lien or mortgage, without a deed from the company, upon the road-bed, right of way, grading, etc., * * * acquired, or to be acquired, by the companies" to which aid was to be extended. And to avoid all possible conflict between the state and other creditors of said aided corporations, the fourth section of said act further provided "that it shall not be lawful for any one of said companies to give, create, or convey to any person or persons whatever, any lien, incumbrance, or mortgage of any

kind, which shall have priority over or come in conflict with the lien of the state herein secured; and every such lien, incumbrance, or mortgage shall be null and void as against the lien of the state." And as a further precaution, the legislature reserved the power to thereafter "enact all such laws as may be deemed necessary to protect the interest of the state against loss in consequence of the issuance of said bonds." Aid was accordingly extended under and pursuant to the provisions of said act to the Cincinnati Cumberland Gap & Charleston Railroad Company.

Among other conditions of this loan was an undertaking by each of said borrowing companies to provide for the payment of the semi-annual interest as the same accrued. The Cincinnati, Cumberland Gap & Charleston Railroad Company failed to do this, but, along with other companies similarly obligated, neglected to provide for the payment of said interest as it matured. Thereupon the legislature, in the exercise of its reserved authority to enact such laws as might be deemed necessary to protect the state's interest, passed the following enactments authorizing and providing for the sale of delinquent railroads. By the first, to-wit, the act of July 1, 1870, three commissioners were appointed to make the sale, who, encountering some and foreseeing other legal obstacles to an advantageous sale, declined to proceed until further legislation could be had, and by a formal report suggested and recommended further and remedial legislation. It was in deference to their recommendation that the act of December 22, 1870, was passed. This act authorized and required said commissioners to file a bill for and in behalf of the state, in the chancery court at Nashville, against all delinquent railroad companies, including the Cincinnati, Cumberland Gap & Charleston Railroad Company, for the purpose of enforcing, under the decrees of said court, a sale of said several delinquent companies' property for the benefit of the state. And among the powers conferred by said act in said court was the authority "to define as may be thought proper" what "the rights and duties and liabilities" of the purchasers should be; the tenth section of said act declaring that the purchaser should be vested with "all the rights, privileges, and immunities appertaining to said franchise to be sold, under the act of incorporation and amendments thereto, and the general improvement laws of the state and acts amendatory thereof."

Thereupon a bill was filed in accordance with the requirements of the foregoing statute, and prosecuted to a final hearing. In the progress of the case, the court, in discharge of the duty enjoined upon it by the statute to adjudicate and determine all questions of law and matters of controversy, of whatever nature, whether of law or of fact, that had arisen, or that might arise, touching the right and interest of the state, and also of the stockholders, bondholders, creditors, and others in said road, and to define "what shall be the rights, duties, and liabilities of a purchaser of the state's interest in said roads," did,

among other things not necessary to be recited, declare that the state had the right, under the law, to have said "roads, property, and franchises" sold in satisfaction of its lien; and that the purchasers thereof would take said "roads, property, and franchises free from all claims whatsoever," except such as were reserved by the decree to secure the payment of the purchase money, together with "all the rights, privileges, and immunities appertaining to the franchise so sold, under its act of incorporation and the amendments thereto, and the general improvement law of the state and acts amendatory thereof." It furthermore adjudged that said company was indebted to the state in the sum of $1,404,680 for bonds previously loaned it, and the matured and unpaid interest thereon, and decreed a sale of said road, property, and franchises, upon the terms and conditions set forth in the decree; and at the sale made pursuant thereto, the complainant, through its agents, became the purchasers thereof; and upon complainant's application, duly made, said sale was confirmed, and "all the right, title, interest, claim, and demand which said Cincinnati, Cumberland Gap & Charleston Railroad Company, its stockholders, creditors, or the state of Tennessee," had in and to said "property, right, franchises, and privileges of said company," which were sought to be, and under the decrees in said cause were ordered to be sold and transferred, were divested out of said parties respectively and vested in the complainant, with all the legal and equitable rights incident thereto, as defined in the former decrees" in said cause, for the period prescribed by law.

Thus it is insisted that the complainant has succeeded to the ownership of the property and franchises and privileges of the Cincinnati, Cumberland Gap & Charleston Railroad Company, including the immunity from taxation previously possessed by said company. This contention, however, is denied by the defendant.

If, as we have endeavored to show, the exemption originally claimed was valid in favor of the Cincinnati, Cumberland Gap & Charleston Railroad Company, it is clear that it was the intention and purpose of the legislature to have transferred it, under the legislation and judicial proceedings recited above, to the complainant as incident to its purchase; but it is now contended that said transfer was in contravention of the constitution of 1870, and therefore invalid and inoperative; and in support of this position the case of *Trask* v. *Maguire*, 18 Wall. 391, is recited on.

*Trask* v. *Maguire* is, in many of its facts, very much like this case. But the two cases are by no means identical. Missouri, like Tennessee, loaned its bonds to railroad corporations to aid them in the construction of their roads, and retained statutory liens on the roads and their appurtenances, with authority, in default of payment, to sell the same. The power to sell was by the law vested in the governor. He was authorized to sell at auction, and to the highest bidder and, in certain contingencies, to buy the roads and property for the

state, subject to such disposition as the legislature might thereafter direct.     After this legislation, the state, in July, 1865, adopted a new constitution containing the following clauses:

"No property, real or personal, shall be exempt from taxation, except property of the state.   The general assembly shall not pass any special law exempting the property of any named person or corporation from taxation."

The railroad in question, to which the state had loaned its bonds, and on whose road and appurtenances it had retained a lien coupled with a reservation of a right to sell, having failed to meet its obligation to the state, was proceeded against and its road and appurtenances sold and bought in by the governor for the state.     This vested the franchise of the company and the title to its property in the state. Being thus vested the legislature, by an act passed for the purpose, appointed commissioners to "sell, convey, transfer, and make over said road, and all its franchises, privileges, and rights, title and interest, appertaining to the road;" and declared therein that "the purchaser thereof should acquire by his purchase all the rights, franchises, privileges, and immunities which were possessed and enjoyed by the original corporation under its charter and laws amendatory thereof."     The commissioners thus appointed sold and conveyed the road as they were required by the law to do.

On these facts it became a question whether the purchaser did acquire the immunity from taxation possessed by the original corporation.     The supreme court held that it did not, but on grounds not at all applicable to this case.     The property of the first corporation, say the court, "was undoubtedly exempt from state and county taxes. But when the state became the purchaser, the immunity ceased; the property stood in its hands precisely the same as any other unincumbered property of the state, exempt from taxation, not by any previous stipulation with the company, but as all property of the state is exempt.     The act under which the resale was made, provided that the purchasers should have all the rights, franchises, privileges, and immunities which were enjoyed by the defaulting company under its charter and laws amendatory thereof.     The question, therefore, was whether the legislature was competent to grant the immunity claimed, under the constitution which went into operation previous to the passage of the act authorizing the sale.     And proceeding to argue the question, the court say: "The plain meaning of the ordinance and acts under which said sale was made" was that the sale should be made "in conformity with such laws as the legislature may constitutionally pass, not in conformity with any law which the legislature could devise, if it had unlimited discretion in the matter."     And to this the court adds that it is "clear that it never was intended" that the sale of the franchise of a defaulting corporation should renew an exemption which had once ceased to exist, and which the constitution had declared should never thereafter be created; that the inhibition of the constitution applies, in all its force, against the renewal of an

exemption equally as against its original creation; and this inhibition the legislature could not disregard in providing for the sale of the property which it had purchased.

. It will be seen that this decision rests upon two very satisfactory grounds: (1) That the ordinance and acts under and in virtue of which the resale of the property and franchises were made never intended to vest the purchaser with the immunity from taxation possessed by the original corporation; and (2) if the legislature had so intended, it could not, in the face of the constitution then existing and prohibiting exemptions, authorize the renewal of an exemption that had been previously extinguished. But this is a very different case. Here the state, being the creditor of an insolvent corporation, was anxious to collect its debt, to secure the payment of which it held a lien on the company's property and franchises, with authority to legislate for its own benefit in relation thereto. A valuable part of this franchise was the exemption of the company's property from taxation. This exemption was a vested right when the constitution of 1870 went into operation, beyond the reach of a constitutional convention or legislative action. It was competent for the state to have legislated, as the state of Missouri did, to have authorized the governor or some other agent to have bought in the property, when sold, in the name and for the, benefit of the state; and if it had done this, the franchise would have revested in the state and been extinguished, and could not, in view of the explicit provisions contained in the constitution of 1870 requiring all property to be taxed, have been renewed.

But this policy was not adopted. The exemption existed; it was valuable property, owned by an insolvent debtor, and in conscience liable for its debts, although there was, at the time, no remedy by which it could have been subjected thereto. In this exigency, the state, being both creditor and legislator, called its reserve power into requisition and provided a remedy. Being desirous of realizing the highest possible price for its debtor's property, it directed a sale of the company's franchise as well as its visible property, and, by way of encouraging bidders and enhancing the price, guarantied, through a solemn adjudication of a competent court made by authority of law, that the purchasers should by their purchase acquire with a title to the property, the rights, privileges, and immunities possessed, and be subject to all the duties and obligations previously resting on the defaulting corporations, as defined by their charters and amendatory legislation.

That it was the intention of the legislature and the court to convey with said property and franchises the immunities granted, as well as to onerate the purchasers with the obligations and duties imposed by the charters of the defaulting companies, is clearly deducible from the legislation in question and the decrees of the court made thereunder. If so, we have successfully distinguished this case from that

of *Trask* v. *Maguire;* that is to say, the legislation in the last-named case, as interpreted by the court, did not intend to vest the purchaser with an immunity from taxation, whereas in this case it did.

This, then, brings us to the consideration of the second proposition: Had the legislature the constitutional authority,—not to grant an immunity from taxation after 1870,—but to provide by law a remedy whereby an outstanding vested franchise, including, among other privileges, an immunity from taxation, could be subjected to a judicial sale for the payment of the just debts of its owner; and for the transfer of the same, in connection with a conveyance of the property to which it was appurtenant, to a purchaser? We think, both upon reason and authority, that it had. Such power has been exercised from time immemorial. Legislatures have without objection from time to time, as the exigencies of the state made it necessary, enlarged remedies by mesne and final processes, for the collection of debts. In this way they have made property, which could not be reached by the ordinary processes of the law, amenable to creditors through some new and appropriate statutory remedy. In this way incorporeal and other valuable interests that could only be reached through courts of equity have been subjected to executions at law. Other illustrations might be given, but it is not deemed necessary. Wherefore, then, is it that the legislature of Tennessee could not in the exercise of its legislative power provide a remedy for subjecting the Cincinnati, Cumberland Gap & Charleston Railroad Company's property, with its vested privileges and other immunities, to sale for the payment of its debts?

In *Memphis & L. R. R. Co.* v. *Railroad Com'rs,* 112 U. S. 609, S. C. 5 Sup. Ct. Rep. 299, the court say "that a franchise to be a corporation is not a subject of sale and transfer, *unless made so by statute which provides a mode for exercising it,* thereby clearly implying that such sale and transfer could be authorized by statute." If the legislature could do this, this controversy is at an end. We have here shown that such sale and transfer was authorized, and the particular mode of executing it provided for. No new exemption is created: the property of said corporation was already exempt from the burden of taxation; the state had no constitutional right to exact a revenue from it; it could have provided for the sale of the property and franchises without including the exemption; and if it had elected to do this, the state would have regained its power of taxation over the same. But the legislature expressly submitted the question to the judgment of the court in a suit to which it was a party, directing, in order that there might be no misconception in regard to the matter, that the court should, by decree, define what the rights and obligations of purchasers should be. The court, in obedience to the legislative mandate, declared that the purchaser would acquire, under such sale, "all the right, title, interest, claim, and demand which the Cincinnati, Cumberland Gap & Charleston Railroad Company, its

stockholders, creditors, the state of Tennessee, and all other parties to said suit herein and to the property, rights, franchises, and privileges of said company," and that the same should "be divested out of them and vested" in the purchaser; and it was subsequently so decreed. This is an adjudication of the question, made at the instance, under legislative authority, and for the benefit, of the state. It was so adjudged in order that bidders might be accurately and judicially advised of the rights which they would acquire in case their bids were accepted. The court defined their rights; declared that they would acquire "all the rights, privileges, and immunities" which the delinquent companies possessed under their charters and amendatory legislation. This decree was pronounced by a competent court, in a suit in which the state by her own volition was complainant for her own benefit, and from which she had the right of appeal. But no objection was interposed, no appeal taken, and no writ of error prosecuted. The adjudication remains unreversed and in full force, and cannot be collaterally attacked in this proceeding. The state having been a party to said suit, and acquiescing in the decision made therein, the sale having been made and the bids offered and received on the faith of said decrees, and said sale having been reported and confirmed by the court, and the immunity from taxation having been vested, along with the other corporate privileges, in the purchasers, the respective rights, liabilities, and obligations of the parties are fixed, and the state, as well as other parties to the cause, is estopped from claiming anything in contravention of said adjudication. The state is as much bound by the adjudication as an individual would be under the same facts.

The adjudication of the supreme court of the United States in, *Railroad Co.* v. *Hamblen Co.*, *supra*, was made upon an imperfect and limited statement of the facts, and is no authority against the decision made herein. The facts of this case are substantially identical with those of *Railroad Co.* v. *Hicks*, *supra*, and the decision made therein by the supreme court of the state is in entire harmony with the views expressed here.

The immunity from taxation may or may not have been a judicious grant. This is a proposition which we are not called on to discuss. Our duty is fully discharged when we declare the law as we find it to exist, and protect the parties in the enjoyment of their legal rights. We think that the legislation and judicial proceedings recited exempts that portion of the complainant's property acquired from the Cincinnati, Cumberland Gap & Charleston Railroad Company, and that it is entitled to the preliminary injunction prayed for.