BUCHANAN, Governor, et al. v. KNOXVILLE & O. R. CO.

(Circuit Court of Appeals, Sixth Circuit. December 9, 1895.)

No. 301.

1. RES JUDICATA—EXEMPTION FROM TAXATION.

By Act Feb. 11, 1852, the state of Tennessee established a scheme of internal improvements, and provided for the loan of bonds of the state to railroad companies, to aid them in constructing their roads, reserving a lien to the state, as security, upon all the property of such companies. By Act Feb. 25, 1856, the K. Ry. Co. was incorporated and the capital stock, dividends, and property of the company were exempted from taxation, with a proviso that, when the dividends should reach the legal rate of interest, taxes might be imposed, but not so as to reduce the dividends below the legal rate of interest. Bonds of the state were loaned to this company under the act of 1852. The aided railroads having defaulted in their debt to the state, and an attempt to sell the roads by commissioners appointed directly by the legislature having failed, an act was passed, on December 21, 1870, which provided that a bill should be filed in the chancery court in behalf of the state against the railroad companies and

all others interested, to foreclose the state's lien, invested the court with full jurisdiction to hear and determine all questions of law and matters of controversy touching the rights and interests of the state and all others, and make all such orders and decrees as should be necessary to a final adjustment of the rights of all parties, and to define what should be the rights, duties, and liabilities of a purchaser of the state's interest, and provided that, upon sale of the franchises of either of the railroad companies, all the rights, privileges, and immunities appertaining thereto should vest in the purchaser. A subsequent act, of January 26, 1871, provided a method for substituting the purchaser of any road to all the rights, privileges, and immunities of the act of incorporation of such road, and for changing its name upon petition to a chancery court. Before the passage of these acts, a new constitution had been adopted, on March 26, 1870, providing that all property should be taxed. On January 20, 1871, a bill was filed, pursuant to Act Dec. 21, 1870, upon which, after due proceedings, an interlocutory decree was entered, determining, among other things, that the roads should be sold, and that, upon a sale of any of the franchises of either of the railroad companies, all the rights, privileges, and immunities appertaining thereto, under the charter of the company or amendments thereof, should be transferred to and vested in the purchaser. The K. Ry. Co. was entitled to no immunity except its exemption from taxation. Pursuant to such decree, the roads were sold and that of the K. Ry. Co. was bid in for $350,000, which bid was accepted and reported, and the sale confirmed, and the state accepted and retained the purchase money. The purchaser afterwards took the proper steps, under the act of January 26, 1871, to be invested with the rights, etc., of the charter of the K. Ry. Co., and to have its name changed to the K. & O. Ry. Co., and, after such steps had been duly taken, a decree was made in the state's suit vesting in the K. & O. Ry. Co. the rights, privileges, and immunities of the K. Ry. Co. Subsequently, the taxing officials of the state proceeded to assess the property of the K. & O. Ry. Co. for taxation, and that company filed a bill to enjoin them from such action. *Held*, that the questions of the application of the immunity from taxation to the franchises as well as the property of the K. Ry. Co., of the effect of the constitution of 1870 upon the exemption, and of the passing to the purchaser of the road of the K. Ry. Co., and the new company organized by him, of the rights, privileges, and immunities of the K. Ry. Co., including its exemption from taxation, having been properly submitted to the state chancery court for its determination, and having been determined in favor of the purchaser, were res judicata as between it and the state, which had accepted the proceeds of the sale under the decree in that suit, and the state was estopped afterwards to claim a right to tax the company.

**2.** STARE DECISIS—CONTROVERSIES OVER TAXES.

Though a judgment in a suit involving taxes for a previous year cannot be used as an estoppel in a controversy over the taxes of a subsequent year, the rule of stare decisis applies to a decision made upon a particular question raised in the earlier case and again arising in the later case.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This was a suit by the Knoxville & Ohio Railroad Company against John Buchanan, governor, M. T. House, and Charles A. Miller, constituting the board of examiners for the assessment of taxes against railroads of the state of Tennessee, and J. W. Allen, comptroller of Tennessee, to restrain the levy and collection of taxes on complainant. The circuit court granted a decree for complainant. Defendants appealed. Affirmed.

The original bill in this case was filed in the court below on the 19th of December, 1891, by the complainant, the Knoxville & Ohio Railroad Company, against the above-named defendants, the first three as constituting the board

of examiners for the assessment of taxes on railroads, and the other as comptroller of the state of Tennessee, to obtain an injunction restraining those officers from levying and collecting taxes assessed upon the property of the railroad company for the years 1891 and 1892, from which taxes it claimed to be exempt by reason of an immunity granted by the state to the Knoxville & Kentucky Railroad Company, and transferred to the complainant upon the purchase by it of the franchises and property of said last-named company. The bill was amended by leave of the court on the 22d day of December, 1893. The defendants answered, admitting their purpose to levy and collect the taxes in question, and justifying their action by the provisions of the constitution of the state of Tennessee of 1870, and of the statutes of that state in regard to the assessment and collection of taxes; and they denied the exemption relied upon by the complainant. An amended answer was subsequently filed.

The facts are not much in dispute, and they are as follows: By an act of its legislature, passed February 11, 1852 (Acts 1851–52, p. 204), the state of Tennessee established a scheme of internal improvements, and provided for the loan of the bonds of the state to railroad companies to aid them in the construction of their roads. To secure the repayment of the sums so loaned to the several companies, the state was declared, by section 4 of the act, to be invested with a lien upon the road, including the stock, right of way, the structures thereon, and equipments, and all the property owned by the company as incident to or necessary for its business. The Knoxville & Kentucky Railroad Company was one of the companies thus aided. By an act of the legislature passed February 25, 1856, that company was authorized to build a railroad from Knoxville, Tenn., to the Kentucky line in the direction of Louisville or Cincinnati; and by the thirty-third section of the act it was provided: "That the capital stock in the said company, the dividends thereon, and the road and fixtures, depots, workshops, warehouses, and vehicles of transportation, belonging to said company, shall be forever exempt from taxation; and it shall not be lawful for the state, or any corporate or municipal, police, or other authority thereof, or of any town, city, county, or district thereof, to impose any tax upon such stock or dividends, property or estate; provided, the stock or dividends, when the said dividends shall exceed the legal rate of interest of the state, may be subject to taxation by the state in common with and at the same rate as money at interest; but no tax shall be imposed so as to reduce the part of the dividends to be received by the stockholders below the legal interest of the state." The amount loaned by the state to this company was $2,816,176. The several railroad companies to whom the state had loaned its bonds under the act of 1852 being delinquent in payment, the legislature of Tennessee, by an act passed July 1, 1870, after reciting the statutes which it was supposed authorized such action, appointed commissioners to sell the interest of the state in the defaulting railroad companies, and authorized them to put the purchaser in possession of the roads. It was further provided, in the act, that in the event that the commissioners should be unable to sell the "defaulting roads" for the amounts due from them, respectively, they take sealed bids therefor, and report them to the legislature, with such recommendations as they should deem best for the interest of the state. Acts 1870, p. 126. This scheme proved unsuccessful; and the legislature, on December 21, 1870, passed a further act, reciting that difficulty had been encountered in making sales under the act of July 1, 1870, on account of various legal questions which had arisen, and providing for a judicial proceeding for the determination of all legal questions affecting the subject, and for the sale of the roads under the direction of the court. Acts 1870–71, p. 25. The preamble and the first and tenth sections of this act were as follows:

"Whereas, in the recent attempts to sell the state's interest in said roads, various legal questions arose, presenting serious obstacles to a sale under the act of 1870, which it is deemed expedient and necessary to obviate before the interest of the state, in said roads shall be again offered for sale; and whereas by the act of 1852, (Chapt. 151) Sec. 12, the right is expressly reserved to the state to enact all such laws in the future as should be deemed necessary to protect the interest of the state, and to secure the state against any

loss in consequence of the issuance of bonds under the provisions of said act, in such a manner as not to impair the vested rights of stockholders of the companies; therefore,

"Be it enacted by the general assembly of the state of Tennessee, that a bill shall be immediately filed in the chancery court at Nashville, in the name and behalf of the state, to which all the delinquent companies, the respective stockholders, holders of the bonds, creditors, and all persons interested in the said several roads, shall be made parties defendants, and shall be brought before the court in the mode prescribed by the rules of practice in chancery established in the state, except as otherwise herein provided. And said court is hereby invested with the exclusive jurisdiction to hear, adjudicate and determine all questions of law and matters of controversy of whatever nature, whether of law or of fact that have arisen or may arise touching the rights and interest of the state, and also of the stockholders, bondholders, creditors and others in said roads; and to make all such rules, orders and decrees interlocutory and final, as may be deemed necessary in order to a final and proper adjustment of the rights of all the parties, preliminary to a sale of the interest of the state in said roads. Also to declare the exact amount of indebtedness of each of said companies to the state; and likewise to define, as may be thought proper, what shall be the rights, duties and liabilities of a purchaser of the state's interest in said roads, or either of them, and what shall be the reserved rights of said companies, stockholders and others, respectively, as against said purchasers after such sale, under the existing laws of the state."

"Sec. 10. That upon the sale of any of the franchises of either of the railroad companies by the commissioners under the provisions of this act, all the rights, privileges and immunities appertaining to the franchise so sold, under its act of incorporation and the amendments thereto, and the general improvement law of the state, and acts amendatory thereof, shall be transferred to and vest in said purchaser, and the purchaser shall hold said franchise subject to all liens and liabilities in favor of the state as now provided by law against the railroad companies."

A supplemental act was passed January 26, 1871 (Acts Tenn. 1870–71, p. 75), providing "that, whenever any person or persons shall hereafter become purchasers of any of the existing railroads on which the state has a lien, or is in any way interested, that may be sold under the laws of the state as they are now or may hereafter be enacted, said person or persons so purchasing may file their petition in the chancery court of either of the counties through which said railroad runs, asking to be substituted to all the rights, privileges and immunities, and subject to all the liabilities of the act of incorporation, under which said railroad company was organized, and amendatory thereof, and for such a change of name or privilege as they may desire; and upon satisfactory evidence being produced of the fact of the purchase and the propriety of the changes proposed, then the chancellor may so adjudicate and decree; and the purchaser or purchasers will be thereby fully clothed with the powers, privileges and immunities of the original act of incorporation, and acts amendatory thereof, and subject to all the liens and liabilities thereby created or incurred."

Previous to the enactment of these last-mentioned statutes, and on March 26, 1870, a new constitution was adopted in Tennessee. It contained, among other provisions, the following: Article 2, § 28: "All property, real, personal or mixed, shall be taxed. * * * All property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state." Article 11, § 8: "No corporation shall be created, or its powers increased or diminished, by special laws; but the general assembly shall provide, by general laws, for the organization of all corporations hereafter created, which laws may at any time be altered or repealed; and no such alteration or repeal shall interfere with, or divest rights which have become vested."

On January 20, 1871, pursuant to the act of the legislature of December 21, 1870, a bill was filed in the chancery court at Nashville, in the name and on behalf of the state, making the Edgefield & Kentucky Railroad Company and the other delinquent railroad companies, and other parties having interests involved, defendants, to carry into effect the objects contemplated by the act.

After reciting the acts of February 11, 1852, and amendatory acts, and the loans to the several railroad companies, it asserted a lien in behalf of the state upon the "entire road of the said several companies, including their stock, right of way, grading, bridges, masonry, iron rails, spikes, chairs, and the whole superstructure and equipment, and all the property owned by the companies, and necessary for the business, and all the depots, stations, its franchises, and property," as security for the loans made by the state, that it had a right to demand a sale thereof, and prayed that the "roads, with all their property, franchises, and rights," be sold. It further prayed that the court "would make all such rules, orders, and decrees, interlocutory and final, as may be deemed necessary, in order to a final and proper adjustment of the rights of all the parties, preliminary to a sale of the interest of your orator in said roads," and should "define, as may be thought proper, what may be the duties, rights, and liabilities of a purchaser of the state's interest in said roads, or either of them." Jurisdiction having been duly obtained, and the case being ready therefor, the court, on the 6th day of July, 1871, made and entered in the case an interlocutory decree determining the rights of the parties and of purchasers in regard to the roads, and what were the incidents of the things to be sold. It determined, among other things, that "upon a sale of any of the franchises of either of said railroad companies by the commissioners, under the decrees in this cause and the provisions of said act of the 21st of December, 1870, all the rights, privileges, and immunities appertaining to the franchise so sold, under its acts of incorporation and the amendments thereto, and the general improvement law of the state and the acts amendatory thereof, shall be transferred to and vested in such purchaser," and it was adjudged and decreed accordingly. Pursuant to the decrees of the court, the roads were sold, among them that of the Knoxville & Kentucky Railroad Company. The purchaser of this last-named company, one W. B. Johnston, having offered therefor, for himself and his associates, the sum of $350,000, their bid was accepted by the commissioners, and the sale reported to the court. The sale was confirmed October 30, 1871, and in its decree of confirmation the court declared that the rights of the purchasers under the sale should be those defined and decreed by the court on the 6th day of July, 1871; and the case was "retained for the purpose of any further orders or decrees necessary to protect and effectuate the rights of the purchasers, or of the state."

Subsequently the purchasers filed a petition in the chancery court of Knox county, under the provisions of the act of January 26, 1871, above recited, and were decreed by that court to be substituted to all of the rights, privileges, and immunities of the act of incorporation under which the Knoxville & Kentucky Railroad Company was organized, and the acts amendatory thereof, and clothed with all the powers, privileges, and immunities of said acts, and the name of the company was changed from the "Knoxville & Kentucky Railroad Company" to the "Knoxville & Ohio Railroad Company." This being done, they filed their petition in the original suit at Nashville, and obtained a decree vesting in the new company "all rights, franchises, privileges, and immunities appertaining and legally incident to the Knoxville & Kentucky Railroad Company, as defined by the former decrees of this court and the laws of the state."

The defendants, who constituted the board of examiners for the assessment of taxes against the railroads, acting under the authority of certain statutes of Tennessee, which, they claim, authorize and require it, assessed the property of complainant, the Knoxville & Ohio Railroad Company, for taxation, for the years 1891 and 1892, at the sum of $806,850. Other incidental facts are referred to in the opinion.

The circuit court sustained the complainant's claim of exemption, and decreed accordingly. The defendants have appealed.

G. W. Pickle, Atty. Gen., and Vertrees & Vertrees, for appellants.

Henderson, Jourolmon & Welcker and Lucky & Sanford, for appellee.

Before TAFT, Circuit Judge, and HAMMOND, J., and SEVERENS, District Judge.

SEVERENS, District Judge, having stated the case as above, delivered the opinion of the court.

The public transactions out of which the present controversy arises have been the subject of considerable litigation in the courts of Tennessee, and on several occasions have been under review in the federal courts, and we have had the aid of the discussions which have taken place in those cases in reaching our present conclusions. An extended argument was made by counsel for the state, in their original brief and at the hearing, upon an analysis of the thirty-third section of the act of February 25, 1856, to prove that, inasmuch as, by the language of the act, exemption from taxation was accorded only to "the capital stock in said company, the dividends thereon, and the road and fixtures, depots, workshops, warehouses, and vehicles of transportation belonging to the company," its franchises were not included, and remained a distinct species of property of the corporation subject to taxation. This contention constitutes the premise from which the deduction is made that the immunity from taxation which is claimed by the appellee to have been acquired through the sale under the decrees of the chancery court at Nashville was not an incident of the franchises of the Knoxville & Kentucky Railroad Company, but was an incident of the particular kinds of property expressly enumerated in the language of the section creating the exemption. And upon the assumption of the further proposition, that the only immunity·mentioned in the operative parts of the decrees was one which was incident to the franchises of the original corporation, the conclusion is reached that no immunity of any kind was acquired by the purchasers at the sale. If the first of these propositions were now for the first time submitted, unaffected by what has since transpired, it seems clear that we should be bound to give it our assent by the rule, now well established, that exemption from taxation can only be supported upon clear and unequivocal language in the law supposed to grant it.

But it must also be admitted that it is very probable that, at the time when this statute was passed, both the state and the railroad company supposed the exemption extended to every species of rights possessed by the corporation, whether of franchises, privileges, or tangible property. The state forebore for a long series of years, and during the whole period of the existence of the Knoxville & Kentucky Railroad Company, to impose any taxes upon the company. The legislature no doubt indicated the public understanding when, in the act of December 21, 1870, by the tenth section, it declared that "all the rights, privileges, and immunities appertaining to the franchise so sold" should pass to the purchaser; for, confessedly, there was no other immunity than the exemption of taxation enjoyed by the railroads. Besides, the exemption of the capital stock and the dividends thereon, by the statute of 1856, was, as we are inclined to think is rightly contended by counsel for the state, an exemption of them as held and owned by the shareholders, and inured directly to their benefit. We do not say that there was

no room for contending that the exemption also extended to the property of the company in the capital stock. It may have been intended to cover the stock in both its aspects. The franchises of the corporation enter into the shares as an element of their value in the hands of the shareholders, and thus a tax upon the franchises comes in the end to be a burden on the stock. The statute itself was not drawn with that precision of language which distinguishes the brief of learned counsel; and the lines of demarkation in the species of corporate property and the rules applicable to the exemption of property from taxation were not then quite so distinct as the discussions of recent years have rendered them. We concede that these considerations would not prevail against the strict rule of construction above referred to; but they sufficiently show that, at the date of the act of December 21, 1870, and of the proceedings in the chancery court thereby authorized, there was a question which touched the substance of the property to be sold, and materially affected its value. It was a proper and competent subject for judicial inquiry and determination.

Another judicial question was whether, under the constitution of the state, adopted in 1870, the immunity was transferable to the purchaser. There is and was at least plausible ground for believing that it was. And the case of Railroad Co. v. Parcher, 14 Minn. 297 (Gil. 224), cited by the appellee, lends confirmation to the view that such provisions as are contained in the Tennessee constitution of 1870 were aimed at the creation of new exemptions rather than the transmission of those already existing, and which the constitution itself could not annul and did not attempt to. A like distinction was also taken in Railroad Co. v. Pickerd, 24 Fed. 614. Counsel for the appellants refer to the case of City of Memphis v. Memphis City Bank, 91 Tenn. 575, 19 S. W. 1045, as establishing a different doctrine. We do not understand that to be the effect of the decision in that case. There a corporation had been chartered, with the proper franchises, for conducting an insurance business, and an exemption from taxation of its property accorded to it. This was prior to the adoption of the constitution of 1870. In 1881 an act was passed authorizing such corporations to engage in banking, and conferring new franchises appropriate to that business; and the same act attempted to transfer to such new franchise the exemption which appertained to the old. Manifestly, this was a mere evasion. The court held that it could not be done. To have held otherwise would have admitted the power of the legislature to have vested the various corporations of the state, chartered for specific purposes, with new franchises adapted to any purpose, and to have transferred the exemptions to such new franchises and business. But this may be quite another thing from the transmission of old franchises and properties, to which, by the existing law, an exemption is incident, whereby there is no enlargement of privileges to the injury of the state. We are not required, however, to pass upon this question, and we express no opinion upon it. It is sufficient to say that it existed and entered into the value of the property of the

railroad companies. These and all other questions affecting the valuable incidents of the property, and, by consequence, the rights which would be acquired by the purchaser, were submitted by the legislature to the decision of the court. The futile attempt which had already been made demonstrated the necessity, and its propriety is manifest from a consideration of the advantage of its being known what the purchasers would obtain through the sale, by submitting all such questions arising under the constitution and laws of the state to the tribunal in which it vested jurisdiction of the subject-matter, and obtaining a determination thereof. The enforcement of its lien by a sale of the franchises and other property of the railroad companies was essentially a proceeding requiring judicial action. The questions involved were liable sooner or later to arise, as the sequel has proven. It was more convenient, and better accorded with public policy, that those questions should be settled then. After the legislature had selected the forum, the state appeared therein as a party, and put the court in motion. The railroad companies and other parties in interest were brought before the court and the case proceeded in due order. An interlocutory decree was entered determining and adjudging what were the rights to be acquired by the purchaser. The sale was duly made of the property as thus defined, and the sale confirmed by the decree of the court. The state took the benefit of the decrees, and appropriated the purchaser's money paid in reliance upon them.

It is the well-established doctrine that, when the state goes into a court of justice as a suitor, to obtain a judicial remedy, it is subject to the same rules, and is to the same extent bound to respect the judgment, as parties are in the case of litigation between private persons. U. S. v. Bank of Metropolis, 15 Pet. 377; U. S. v. O'Grady, 22 Wall. 641; State v. Dennis, 39 Kan. 516, 18 Pac. 723; Fendall v. U. S., 14 Ct. Cl. 247.

In U. S. v. Arredondo, 6 Pet. 691–729, it was said:

"It is a universal principle that, where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter; and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and powers conferred. The only questions which can arise, between an individual claiming a right under the acts done and the public or any person denying its validity, are power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer, whether executive, legislative, judicial, or special, unless an appeal is provided for, or other revision by some appellate or superior tribunal is prescribed by law."

It does not matter that a constitutional question was involved. The court was as competent to deal with that, in a case to which the state was a party, as in private litigation, and if it can be done at any time, why could it not be done then? It is a matter of frequent occurrence that the courts are required to do this in cases promoted by the state, and surely the validity and efficacy of their determinations cannot be gainsaid by subsequent collateral question of their correctness. To say that such questions remain open in the

present case is to deny that any substantial object was gained by the resort to the court for a sale.

The question which remains is whether, upon a just and reasonable construction, the act of December 21, 1870, contemplated the submission to the court of such questions as were incident to the subjection of the property to sale, and, if so, whether they were so determined as that the immunity now claimed by the Knoxville & Ohio Railroad Company passed with the property to the purchasers. And we have no doubt upon either of these two points. The language of the act is:

"The said court is hereby invested with the exclusive jurisdiction to hear, adjudicate and determine all questions of law and matters of controversy of whatever nature, whether of law or fact that have arisen or may arise touching the rights and interest of the state, and also of the stockholders, bondholders, creditors and others in said roads; and to make all such rules, orders and decrees, interlocutory, and final, as may be deemed necessary in order to a final and proper adjustment of the rights of all the parties preliminary to a sale of the interest of the state in said roads; also to declare the exact amount of indebtedness of each of the companies to the state, and likewise to define, as may be thought proper, what shall be the rights, duties and liabilities of a purchaser of the state's interest in said roads or either of them."

The court was authorized to make all such decrees as it deemed necessary to finally adjust the rights of all the parties preliminary to a sale, and to define what should be the rights, duties, and liabilities of a purchaser of the state's interest in said roads, or either of them. The purpose of this is manifest. It was to have settled and adjudged what was to be sold, so that the purchaser would be certain what he was buying, and what rights were incident to it, and to give him a secure reliance upon an express adjudication. The language is elaborate to express such purpose. The bill filed by the state claimed a lien upon "the entire road of the company, including stock, roadbed and superstructure, all the property owned by the company and necessary for its business, and all the depots, stations, its franchises, and property." It demanded a sale of the road, with all its "property, franchises, and rights," and prayed that the court should "define, as may be thought proper, what may be the duties, rights, and liabilities of a purchaser of the state's interest in said roads, or either of them." The interlocutory decree, passed July 6, 1871, preliminary to the sale, declared, among other things, that in the opinion of the court, "upon a sale of the franchises of either of said railroad companies by the commissioners under the decrees in this cause and the provisions of said act of the 21st of December, 1870, all the rights, privileges, and immunities appertaining to the franchise so sold, under its acts of incorporation and the amendments thereto, and the general improvement law of the state and the acts amendatory thereof, shall be transferred to and vested in the purchasers." And it was ordered and decreed that the rights of the parties be settled and adjudged accordingly. Thereupon W. B. Johnston proposed to the commissioners to give $350,000 in the bonds of the state "for the Knoxville & Kentucky Railroad, its franchises, and privileges, including state's interest."

This offer was accepted by the commissioners and reported to the court. An order or decree of confirmation was duly entered, reciting that it appeared to the satisfaction of the court that the sale had been made in conformity with its previous decrees, and declaring that the rights of the purchasers were in that cause set forth and decreed on the 6th day of July, 1871. By this decree the case was retained for the purpose of making any further orders or decrees necessary to protect and effectuate the rights of the purchasers and of the state. The purchaser and his associates having been subsequently organized, under the supplementary act of January 26, 1871, as the Knoxville & Ohio Railroad Company, the court made its final decree, adjudging and decreeing that all the right, title, and interest which the Knoxville & Kentucky Railroad Company and the state of Tennessee had in and to that company's road, property, and franchises, so sold, be divested out of said company and the state, and with all the rights, privileges, and immunities appertaining and legally incident, as defined by the former decrees of the court and the laws of the state, be vested in the Knoxville & Ohio Railroad Company.

We recognize fully the doctrine that a claim of exemption from taxation can only be sustained upon clear and unmistakable grounds. We think the counsel for the appellants state the doctrine rather too strongly when they urge that the court is required to hunt for an escape from the exemption. It is a question for sound and reasonable construction, with the presumption against an intent to create or transfer it. But if the intent clearly appears the court is bound, without evasion, to give it effect. And we are willing to concede that the rule of strict construction is as appropriate to the decrees made in the case by the chancery court at Nashville as to a statute involving the same question. We may concede, also, for the purposes of this discussion, although it may be an open question, that the declaration made in the tenth section of the act of December 21, 1870, "that upon the sale of any of the franchises of either of the railroad companies by the commissioners under the provisions of this act, all the rights, privileges and immunities appertaining to the franchise so sold, under its act of incorporation and the amendments thereto, and the general improvement law of the state and acts amendatory thereof, shall be transferred to and vest in said purchaser, and the purchaser shall hold said franchise subject to all liens and liabilities in favor of the state, as now provided by law against the railroad companies," was inoperative under the constitution of 1870. Still this in no wise impairs the effect of the judicial proceeding, and we think it indubitably appears from them that the question whether the exemption from taxation of the property (using that word in its generic sense) of the Knoxville & Kentucky Railroad Company was an incident of what was sold, whether it was transmissible, and would be transmitted by the sale, was competent to be submitted, and was in fact, among those submitted, by the state, and that the court held and decreed that the immunity was an incident, that it was transmissible, and should pass. Some of the language employed, both in the statute and in the decrees, is manifestly not used with technical precision.

For example, the word "franchise" is used sometimes to denote all the rights, powers, and privileges of the company, in its large sense, as it was in a statute of Georgia which was under consideration in the supreme court in Railroad Co. v. Georgia, 98 U. S. 359, and sometimes in a still larger sense to signify all that the company possessed.    One of the legal meanings of the word, approaching very closely to its primary signification, is "freedom," "exemption," "immunity."    It is true that the term is now generally used in more restricted senses, and for that reason the supreme court of the United States has held in a number of cases that, because of the reasons for adopting a strict construction of language claimed to create or transfer exemptions from taxation, and a presumption against an intent to do either, a reference to the "franchises" of a corporation would not include its immunities, in the absence of other language or circumstances indicating that the term was used with a signification wide enough to include them.

But while the terms employed in the statutes and decrees under consideration were used in differing senses, it is not difficult to detect in any instance the sense intended, and upon the whole the meaning is clear.    Confessedly, the term "immunity" is an apt one to describe an exemption from taxation.    The Knoxville & Kentucky Railroad Company had such an exemption, and there was no other immunity to which the language of the decrees could be applied.    The state, having acquiesced in the decrees of the court and taken the benefit of them, ought to be precluded from now asserting that they proceeded upon erroneous views.

We have made the foregoing extended résumé of the proceedings in the chancery court, because the counsel for the appellants, in their supplementary brief, have brought the case to the test of the construction of the decree entered in those proceedings.    They affirm that:

"The question in this case is not the construction of a state constitution nor of a state statute.  It is merely a question of the construction of a decree rendered by a state court.  True it is that the court rendered the decree pursuant to the empowering terms of the statute; but the inquiry is not, primarily, as to the meaning of the statute, but as to the meaning of the decree. The decree might be in the teeth of the statute, and be valid, because it is a decree.  For the reason, then, that the question is not the construction of the statute of a state, but is the construction of a decree, the cases cited by the appellee to the effect that the federal courts follow state decisions construing their own statutes are irrelevant."

Again, they say:

"The only questions are as to the validity and interpretation of the original decree of sale.  We maintain:  (1) That decree, in so far as it assumes to pass an exemption from taxation, is beyond the pleadings, and therefore coram non judice and void.  (2) Fairly and correctly interpreted according to the rules which govern tax-exemption cases, the terms of that decree do not pass the exemption which the old company enjoyed.  (3) Inasmuch as the complainant comes into this court of equity to actively obtain the benefit of that decree [of alleged exemption], it devolves upon it to affirmatively show that the decree was a right decree."

As to the first of these contentions, it will be seen, by reference to the act conferring jurisdiction, that, after reciting that serious·

obstacles had arisen upon a former attempt to sell the roads because of various legal questions, it authorized the court to adjudicate and determine all questions of law or fact that had arisen or might arise touching the rights and interests of the state and the other parties interested in the roads, to make all orders and decrees deemed necessary to a final adjustment of the rights of all the parties preliminary to the sale, and to define what would be the rights, duties, and liabilities of the purchaser. By reference to the bill it appears that, after claiming a lien upon the road, "its franchises, and property," and asserting a right to a sale thereof, it prayed for a sale of the "roads, with all their property, franchises, and rights," and that the court should define, as might be thought proper, what should be the rights, duties, and liabilities of the purchaser. Now, whether or not it was indispensably necessary, under this act, that there should be a pleading of the matters upon which the court should adjudicate, we think its action was sufficiently invoked by the matter pleaded and the prayer of the bill.

The second of the above propositions, namely, that "the terms of the decree do not pass the exemption which the old company enjoyed," we have already considered.

In reference to the third proposition, we do not deem it applicable. The rights of the purchaser are founded on the decree. The purchase price was paid upon the faith of it. This is not a direct proceeding to obtain the benefit of it, as counsel seem to assume, but a bill filed to enjoin an invasion of rights obtained through the decree, and the question of the correctness of it arises collaterally. A party prosecuting or defending in an independent suit a right secured by the judgment or decree in a former one is not exposed to attack upon the ground that such former judgment or decree was not a right one. Where the former decree is incomplete, or, from some defect or change of circumstances which embarrasses its operation, cannot be carried into effect, a bill will, in proper circumstances, lie to help out the infirmity, and give an effectual remedy. The aid of the court being thus invoked to help out a defective decree, it will inquire if it is such a decree as it would be equitable to infuse with vitality. If not, the equity of the new bill fails. Coop. Eq. Pl. 99; Mitf. Eq. Pl. 95, 96, and cases cited; Story, Eq. Pl. § 430. Such was the case of Lawrence Manuf'g Co. v. Janesville Cotton Mills, 138 U. S. 552, 11 Sup. Ct. 402, where the plaintiff, having obtained in a former suit by consent in the same court a decree which it deemed imperfect, and needing to be "pieced out," filed a bill, the object of which was to make the decree whole, and to carry it into effect. In another case the supreme court had held that, in such a case as that upon the plaintiff's original bill, there was no equity, and it thereupon affirmed the dismissal of the bill in the case then before it, for the reason that the decree proposed to be aided had no equity in it. Chief Justice Fuller, delivering the opinion of the court, said:

"Where a party returns to a court of chancery to obtain its aid in executing a former decree, it is at the risk of opening up such decree as respects the relief to be granted on the new bill."

That is a very different case from that of a party who stands on a complete decree, and seeks no other benefit or advantage than that which is due by the general law from a former judgment. A purchaser at a judicial sale does not hold his rights at the risk of an impeachment of the judgment on which it is founded, for error.

The conclusion which we have reached upon the principal question discussed is in accord with the rulings of the supreme court of Tennessee in the cases of Railroad Co. v. Hicks, 9 Baxt. 446, and State v. Nashville, C. & St. L. R. Co., 12 Lea, 593. The first was a case involving the very questions we have to deal with in the present case. That of State v. Nashville, C. & St. L. R Co., 12 Lea, 593, was a case involving a like question arising upon a sale of another railroad under the same decree. In both of them the exemption was upheld. The former case is denied by counsel to have authority, because, as it is urged, the material point was not mooted by the party representing the state. Whatever may be the merits of this criticism, it must be admitted that in the later case, above cited, the subject was fully discussed and the correctness of the result in the Hicks Case was upheld. In so far as these cases declare the meaning and effect of the statutes of Tennessee, they are binding upon the federal courts. By their interpretation of the decrees of the chancery court at Nashville in the case in State v. Edgefield & Kentucky Railroad Company and others, and their determination of the effect to be given them, inasmuch as they have been decided since the rights of the parties vested, we are not bound. At the same time great respect and consideration is due to those decisions, for the reason, among others, of the familiarity of that court with the usages and practice of the courts of the state.

Counsel for the appellee contend that the judgment in the Hicks Case, because, as they claim, it was a determination of the same issue between the present plaintiff and the representative of the state, should be treated as an estoppel. It was held by Judge Thayer at the circuit, and by the supreme court on appeal, in Keokuk & W. R. Co. v. Missouri, 41 Fed. 305; Id., 152 U. S. 301, 14 Sup. Ct. 592, that a judgment in a suit involving taxes for a previous year could not be used as an estoppel in a controversy over the taxes of a subsequent year. Whether that decision would apply to a particular question raised and decided in the former case, and which is not affected by new facts, we are not sure. It was intimated by Mr. Justice Brown, who delivered the opinion of the supreme court in that case, that "if there were any distinct question litigated and settled in the prior suit, the decision of the court upon that question might create an estoppel in another suit, upon the principle stated in Cromwell v. Sac Co., 94 U. S. 351." But in another part of the opinion it is said that "it could never be tolerated that the state should be forever bound in its collection of taxes by an erroneous decision." And it may be that, for reasons grounded on public policy, the rule of res judicata should not be applied even to such a question. It is entirely consistent with that case that the doctrine of stare decisis should be applied to such, as to other cases, and there would appear to be equally cogent reasons for it. In

that view, a federal court sitting in the same territorial jurisdiction should have a clear conviction of error in the state decisions before it would be justified in overturning them, although they are not absolutely binding upon it.

It is proper to note in this connection that the general question here involved was in a previous case submitted to the circuit court of the United States for the Eastern district of Tennessee, Judge Baxter presiding, that of Railroad Co. v. Pickerd, 24 Fed. 614. In that case the complainant sought to restrain the collection of taxes from which it claimed to be exempt through its purchase of the road of the Cincinnati, Cumberland Gap & Charleston Railroad Company, another of the railroad companies who were defendants in the case of State v. Edgefield & Kentucky Railroad Company and others. Two questions were presented for decision—First, whether the Cincinnati, Cumberland Gap & Charleston Railroad Company had such an exemption; and, second, if it had, whether it passed by the sale under the above-mentioned decree of July 6, 1871. The court held in the affirmative of both these questions. The decree was reversed in the supreme court upon the ground that the Cincinnati, Cumberland Gap & Charleston Railroad Company did not have the exemption claimed, and so that there was no exemption to pass. That court, therefore, did not pass upon the second question, and left the reasoning of the circuit court upon that point intact. The opinion of Judge Baxter contains an elaborate discussion of the question of the effect of the decrees of the chancery court, and holds that by them the immunity was adjudged to be an incident of the subject of sale and passed with it to the purchaser. So far as appears, there has been a consensus of opinion of the courts in Tennessee upon this question. We think that the case of City of Memphis v. Memphis City Bank, 91 Tenn. 575, 19 S. W. 1045, is not an authority to the contrary, as it did not involve the consequences of a judicial determination and a sale thereon.

Several decisions of the supreme court of the United States are cited by counsel for the appellants, some in support of the doctrine of strict construction against exemptions, and some which are supposed to have a particular analogy to the present case. We admit, as we are bound and willing to do, the existence and necessity of the rule contended for. In regard to the cases cited as having special application to the present, we have carefully examined them all, but find nothing in them in conflict with the views which we have expressed. In Railroad Co. v. Hamblen Co., 102 U. S. 273, the question here involved was not presented. The record in that case showed nothing but the statute, the sale, and the order of confirmation. The decree upon which the sale was had was not shown. What we think was the vital fact was omitted. The court distinctly state that there was nothing before them to indicate that anything more was sold than the state's interest, and the conclusion necessarily followed that nothing more was sold, as the presumption was against it. The chief justice, in delivering the opinion, distinguishes the case from the Hicks Case, above referred to, by noting that in that case it was shown that, by the decree in the case in

which the sale took place, the exemption was adjudged to have been part of the subject of sale, but reiterates that nothing of that kind appeared in the case then before the court. In the case of Wilson v. Gaines, 103 U. S. 417, a bill had been filed to restrain the collection of taxes upon a part of the railroad once owned by the Edgefield & Kentucky Railroad Company, the first-named defendant in the chancery case at Nashville of the state against the railroads. The case was heard upon a demurrer to the bill, which, after setting out the incorporation of the old company with an exemption, the loan by the state and the act of December 21, 1870, alleged that, "under a bill filed to foreclose the state's statutory lien upon the road and superstructure, equipments and stock, and the property owned by the company as incident to or necessary for its business, etc., the road, its franchises, property, rights, privileges, and immunities, etc., were sold," and this was all that was shown to indicate what the court had held or decreed ought to and did belong to the property sold. Thus there was nothing but the statute conferring the jurisdiction, and the fact that a bill was filed and there was a sale. The court held that the bill was fatally bad in not showing that anything more was sold than barely the interest of the state, and that it did not bring under review such a case as was shown in Knoxville & Ohio Railroad Company v. Hicks, then an unreported case. Picard v. Railroad Co., 130 U. S. 637, 9 Sup. Ct. 640, which is the case on appeal from that reported in 24 Fed., above referred to, does not decide anything very pertinent to the present inquiry. It was there held that the reference in the statutes creating the franchises of the Cincinnati, Cumberland Gap & Charleston Railroad Company to the "rights, powers, and privileges" of another company, as the measure of the franchises intended to be conferred, would not include the immunity from taxation which the other company enjoyed, in the absence of anything in the statutory provisions relating to the matter which indicated a positive intention that the immunity should be regarded as a privilege. But in the case of Tennessee v. Whitworth, 117 U. S. 139, 6 Sup. Ct. 649, it was held that, in view of the peculiar use of the word "privileges" in the statutes of Tennessee, a consolidated corporation, organized with all the "powers and privileges" of its constituents, acquired the same immunity from taxation which they possessed. These last two cases illustrate what we have before in substance said, that the question must depend upon the intention evinced by a comparison of all the provisions bearing upon the subject, starting with the presumption that an exemption is not intended.

The views which we have expressed are essentially in agreement with those entertained by the learned judge who heard and decided the case in the circuit court, and lead to an affirmance of the decree there entered, with costs; and it is ordered accordingly.

HAMMOND, J. The original act, in my opinion, was a complete exemption of all the property, including the franchises, until the earnings should exceed 6 per cent., the power then to tax being reserved to the limited extent mentioned in the proviso. The enu-

meration of particular species of the corporate property which were to be exempt from taxation is controlled in its otherwise possible implications by the subsequent prohibition of "any tax upon such stock or dividends, property or estate," and more by the broader language of the proviso that "no tax" shall be imposed which reduces the dividends to be received by the stockholders below 6 per cent. Any tax, however and upon whatsoever levied, would always operate to reduce the funds available for dividends to the stockholders and if it left less than 6 per cent. for them would violate this rule of protection. The whole scheme was one of prohibition and exemption, which should leave for the stockholders 6 per cent. dividends out of the earnings at all events as against the power to tax, and this proviso for that purpose reacts upon all the words of the statute, enlarges their meaning, and leaves them unequivocal in their prohibition of the tax that was levied in this case. The subsequent acts of the legislature in plain terms attached the quality of transmissibility to this exemption, and it passed to the purchaser at the state sales, there being no prohibition of this in the constitution of 1870 as to a corporation and an exemption already existing when that instrument was ordained. If this construction be correct, the exemption claimed by the appellee must be sustained, without reference to what took place in the process of judicial foreclosure.