STATE, *ex rel., v.* B. A. ENLOE *et al.*

(*Nashville.* December Term, 1908.)

1. **MANDAMUS.** Result to the State in overruling demurrer must be considered by court, when.

In determining whether the public interest will justify a litigation along the lines laid down in a bill for *mandamus* against the officers of the State, it is incumbent upon the supreme court to inquire into the nature of the contest into which the State would be plunged upon overruling a demurrer thereto, sustained below, and remanding the cause for trial. (*Post, pp.* 352-355.)

Cases cited and approved: Harris v. State, ex rel., 96 Tenn., 496, 516-518; State v. Wilbur, 101 Tenn., 211; State, ex rel., v. Taylor, 119 Tenn., 229, 258, 259, 264, 276, 277.

2. **RES ADJUDICATA.** In tax cases is limited to the taxes actually in litigation.

The plea of *res adjudicata* in tax cases is to be limited to the taxes actually in litigation, and the judgment is not conclusive in respect of taxes assessed for other and subsequent years. (*Post, pp.* 377, 378.)

Case cited and approved: Bank v. Memphis, 101 Tenn., 154.

3. **MANDAMUS.** By counties to compel the assessment of a railroad's property for taxation will be refused where its grant would be detrimental to the State.

Where, in a *mandamus* suit by certain counties to compel an assessment of the property of a certain railroad company, it appears that the legitimate effect of granting the writ would be to deprive the State of the great benefit it obtained in inducing the railroad company to waive its exemptions and to go upon the tax list as other railroad companies, and to deprive it of a large amount paid yearly by the company for several years, which the State would be bound in honor to refund as received under a repudiated contract, but which, if not willingly re-

turned, would have to be credited upon any taxes recovered by litigation; and that another effect, as the court judicially knows, would be to open up a similar and a much larger controversy with another railroad company that settled its litigation, over its exemptions, with the State by an agreement to pay yearly a certain sum up to a date fixed, and then to go upon the tax list as other railroad companies; and where, in exchange for these great losses, the State would obtain, under the bill, simply the right to institute and maintain many lawsuits against railroad companies, all of which might prove fruitless, a demurrer to the bill will be sustained, and the *mandamus* refused in the proper exercise of the court's discretion. (*Post, pp.* 374-379.)

4. **SAME. Suit by county without the name of the State; suit by State on relation of county is county's suit.**

Counties may maintain a bill in their own names for a *mandamus* to compel the assessment of railroad property for taxation, and the use of the State's name in behalf of the counties is altogether unnecessary; and where such suit is brought in the name of the State in behalf of the counties, on relation of the counties and their county judges, the counties are the real parties complainant, and the appearance of the State in such case is merely nominal. (*Post, p.* 379.)

5. **SAME. Same. No statute authorizes suit by State in behalf of counties to compel tax assessments.**

There is no statute authorizing the use of the name of the State in behalf of a county in a *mandamus* suit to compel the assessment of railroad property for taxation. Such suit is not authorized by Shannon's Code, section 495, which regulates suits in the name of the State for the counties; nor by sections 5165-5187 thereof, which regulate proceedings in the name of the State against corporations and to prevent the usurpation of office. (*Post, p.* 379.)

Code cited and construed: Secs. 495, 5165-5187 (S.); secs. 461, 4146-4168 (M. & V.); secs. 3409-3431 (T. & S. and 1858).

State, ex rel., v. Enloe.

6. **RES ADJUDICATA.** State must sue by the attorney-general to be bound by the suit.

When the State is to be bound by proceedings to collect taxes or other debts due it by suits at law or in equity, it must appear by the attorney-general of the State, pursuant to statute (Shannon's Code, sec. 5756, subsec. 5). (*Post, p.* 379.)

Code cited and construed: Sec. 5756, subsec. 5 (S.); sec. 4720, subsec. 5 (M. & V.); sec. 3952a, subsec. 1 (T. & S.).

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County. W. H. WILLIAMSON, Special Judge.

HENRY HUDSON, R. A. SANSON, R. E. L. MOUNTCAS-TLE, J. W. CULTON, and HARRY STOKES, for plaintiffs.

ATTORNEY-GENERAL CATES, for defendant State Board of Railroad Commissioners.

JOUROLMON, WELCKER & SMITH, for defendant Southern Railway Company.

---

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in the present case was filed by the State of Tennessee, upon the relation of A. D. Collier, county judge of Knox county, Clem. J. Jones, county judge of Anderson county, and William Allen, county judge

of Campbell county, acting for and on behalf of the said counties of Knox, Anderson and Campbell, and upon the relation of the said counties of Knox, Anderson, and Campbell, against B. A. Enloe, Harvey H. Hannah, and Frank Avent, constituting the Tennessee State board of railroad commissioners, and ex officio assessors for the State of Tennessee of railroad properties for taxation.

The purpose of the bill is to compel by the writ of *mandamus* the railroad commissioners to assess for taxation the property of the Knoxville & Ohio Railroad Company, a line of railway running from the city of Knoxville, through the three counties named, to the Kentucky line at Jellico.

The bill was filed in the circuit court of Davidson county on the 8th of October, 1907. It prayed for an alternative writ of *mandamus*, directing the defendants to assess the property of the railroad company for the year 1907, and to back assess the property for the ten preceding years, or to show cause at the next term of the court for not doing so. There was also a prayer that the defendants be required by the alternative writ to continue and remain in session as the State board of tax assessors, "pending and until the final determination of this case, so that such writ of *mandamus* to assess said railroad property above prayed for, if made permanent upon the hearing, may be operative as against said defendants." It was charged in the body of the bill, under an amendment allowed, that the

defendants were in session as a board at the time the bill was filed.

The bill was signed by the several county judges, and by the attorneys for the counties. At the bottom of the bill was the following entry:

"I hereby consent, on behalf of the State of Tennessee, to the filing of the foregoing petition for writ of *mandamus*, in the name of the State of Tennessee, upon the relation of the counties of Anderson, Campbell, and Knox, and Clem. J. Jones, William Allen, and A. D. Collier, county judges of said counties, against B. A. Enloe, Harvey H. Hannah, and Frank Avent, State board of railroad commissioners, and State board of tax assessors, this October 8, 1907.

"[Signed]         F. M. BASS,
"Attorney-General for Davidson County."

The defendant railroad commissioners filed a demurrer, and also an answer, to the bill.

The Southern Railway Company, although not named in the caption as a defendant, seems to have been admitted as a defendant and allowed to file a demurrer and answer to the bill, as the real party in interest; that company being now the owner of the property of the Knoxville & Ohio Railroad Company.

The demurrers were sustained in the court below, and the complainants thereupon appealed to this court, and have here assigned errors.

Before stating the substance of the bill, it is proper
that we should enunciate certain principles that control
in controversies wherein the writ of *mandamus* is asked
of the court.

In the case of *State* v. *Wilbur*, 101 Tenn., 211, 47 S.
W., 411, this court quoted with approval the following
excerpt from High on Extraordinary Legal Remedies
(3d Ed.), section 39:

"The right of *mandamus* being justly regarded as one
of the highest rights known to our system of jurispru-
dence, it issues only when there is a clear and specific
legal right to be enforced, or a duty which ought to be
and can be performed, and where there is no other
specific and legal remedy. The right which it is sought
to protect must therefore be clearly established, and
the writ is never granted in doubtful cases. The per-
son seeking the relief must show a clear legal right to
have the thing sought by it done, and done in the man-
ner and by the person sought to be coerced. The writ,
if granted, must also be effectual as a remedy, and must
be within the power of the respondent, as well as his
duty, to do the act in question. It follows, also from
the important position which this writ occupies as a
remedial process, as well as from its nature as an ex-
traordinary remedy, that the exercise of the jurisdic-
tion rests, to a considerable extent, in the sound discre-
tion of the court, subject always to well-settled princi-
ples, which have been established by the courts or fixed
by legislative enactments. Causes may therefore arise

State, ex rel., v. Enloe.

where the applicant for relief has an undoubted legal right for which *mandamus* is the proper remedy, but where the court may, in the exercise of a judicial discrimination, still refuse the relief."

In the case of *Harris* v. *State, ex rel.,* the court had under consideration a case wherein the writ of *mandamus* was sought against the State board of tax assessors, to compel them to perform certain duties in respect of obtaining information needed for proper assessment of the railroads of the State. At the time the application was made, or at least when it came before the court, the assessment had been passed into the hands of the various county officials having charge of the matter, and a very large part of the taxes which fell under the assessment had been paid, and the court held that although the State board of tax assessors had been guilty of a breach of duty in not obtaining the information referred to, yet that under the facts stated, and other facts referred to in the opinion, it would not be to the interest of the State that the question should be overhauled, and the writ was denied. Speaking with reference to the powers of the court upon this subject, it was said in the opinion:

"Without further analysis of the pleadings we have, then, a record before us in which the assessors admit, either in express terms or by necessary implication, serious official delinquency, a negligence and indifference in the discharge of statutory duties which is inexcusable, and threaten to render abortive a system

121 Tenn—23

of assessment the work of years of legislative experiment. But the question still remains, even in view of this, will the court, while it has the power, interfere by the writ of *mandamus*? It is well settled that 'the courts have a discretion whether they will issue or refuse the writ, even where a *prima facie* right thereto is shown.' Merrill on Mandamus, section 62. 'In exercising such discretion, the court will consider all the circumstances reviewing the whole case, with due regard to the consequences of its action.' Merrill on Mandamus, section 63. *Alger* v. *Seaver,* 138 Mass., 331; *People* v. *Ketchum,* 72 Ill., 212; *People* v. *Genesee County Circuit Judge,* 37 Mich., 281. . . . To the same effect is the text of Spelling on Extraordinary Relief, vol. 2, section 1372: 'The writ will usually be refused, notwithstanding a clear right is shown, if, by granting it, public interest would be seriously prejudiced or public transactions hindered, or the rights of third parties interfered with injuriously.' " 96 Tenn., 496, 516, 517, 518, 34 S. W., 1017, 1022.

In *State, ex rel.,* v. *Taylor,* 119 Tenn., 229, 258, 259, 264, 276, 277, 104 S. W., 242, it was held that where a demurrer to the petition or bill for *mandamus* is overruled, the court will ordinarily award a peremptory writ at once, but will sometimes allow an affidavit showing the defense which the party desires to interpose, or a sworn answer containing these defenses; and if, upon examination of these papers, it conceives that a reasonable defense is offered, it will remand the cause for an-

swer and further proceedings. In the present case the defendants filed their answers along with their demurrers. It is apparent, under the rule just stated, that it will be incumbent upon this court, in determining whether the public interest would justify a litigation along the lines laid down in the bill, to inquire into the nature of the contest into which the State would be plunged upon overruling the demurrer and remanding the cause for trial.

With these preliminary observations, we shall now state the substance of the controversy. In doing this we not only refer to the language of the bill and exhibits thereto attached, but also to the history of the controversy as disclosed by the authorities referred to in the bill.

It appears from the bill that the Lexington & Knoxville Railroad Company was duly chartered by the State of Tennessee by and under chapter 244, p. 385, of the Acts of the Legislature of 1851-52. The name of this company was thereafter, by chapter 324, p. 762, of the Acts of 1853-54, changed to the Knoxville & Kentucky Railroad Company, and the charter was amended accordingly; and thereafter by chapter 217, p. 434, of the Acts of 1855-56, the legislature further amended the charter by adding thereto the following provisions, viz.:

"Sec. 33. Be it enacted, That the capital stock in the said company, the dividends thereon, and the road and fixtures, depots, workshops, warehouses and vehicles of transportation, belonging to said company, shall be

forever exempted from taxation; and it shall not be lawful for the State, or any corporate or municipal police, or other authority thereof, or of any town, city, county, or district thereof, to impose any tax upon such stock or dividends, property or estate: Provided, the stock or dividends, when the said dividends shall exceed the legal interest of the State, may be subject to taxation by the State in common with and at the same rate as money at interest; but no tax shall be imposed so as to reduce the part of dividends to be received by stockholders below the legal interest of the State."

By the Act of 1851-52, known as the "Internal Improvement Law of Tennessee," the legislature of Tennessee furnished certain State aid to said Lexington & Knoxville Railroad Company. Thereafter, upon said railroad company becoming in default to the State, and because of the nonpayment by it of its indebtedness to the State, pursuant to certain acts of the legislature, towit, chapter 79, p. 126, of the Acts of 1870, and chapter 23, p. 25, of the Acts of 1870-71, certain proceedings were instituted by the State of Tennessee against said Knoxville & Kentucky Railroad Company, and other delinquent railroad companies, in the chancery court of Davidson county, under the name and style of *State of Tennessee* v. *Edgefield & Nashville Railroad Company;* and such proceedings were had in said cause as that the interest of the State in said Knoxville & Kentucky Railroad Company was duly sold and bought in by W. B. Johnson and others, who thereafter

in compliance with the authority conferred by the State of Tennessee by legislative acts thereto appertaining, duly incorporated themselves under and by a decree of the chancery court of Knox county under the name and style of the Knoxville & Ohio Railroad Company, which said company has, since said incorporation, down to the date of its conveyance of its property to the Southern Railroad Company, claimed to own and operate said railroad properties and to be entitled to all of the exemptions from taxation set forth in the said act amending the charter of the said Knoxville & Kentucky Railroad Company.

. The preamble and the first and tenth sections of the Act of 1870-71 were as follows:

"Whereas, in the recent attempt to sell the State's interest in said roads, various legal questions arose, presenting serious obstacles to a sale under the act of 1870, which it is deemed expedient and necessary to obviate before the interest of the State in said roads shall be again offered for sale; and whereas, by the act of 1852, chapter 151, section 12, the right is expressly reserved to the State to enact all such laws in the future as shall be deemed necessary to protect the interest of the State, and to secure the State against any loss in consequence of the issuance of bonds under the provisions of said act, in such manner as not to impair the vested rights of stockholders of the companies; therefore,

"Be it enacted by the general assembly of the State of Tennessee, that a bill shall be immediately filed in

the chancery court at Nashville, in the name and behalf of the State, to which all the delinquent companies, the respective stockholders, holders of the bonds, creditors and all persons interested in the said several roads shall be made parties defendants, and shall be brought before the court in the mode prescribed by the rules of practice in chancery established in the State, except as otherwise herein provided. And said court is hereby invested with the exclusive jurisdiction to hear, adjudicate and determine all questions of law and matters of controversy of whatever nature, whether of law or of fact, that have arisen or may arise touching the rights and interests of the State, and also of the stockholders, bondholders, creditors and others in said roads; and to make all such rules, orders and decrees, interlocutory and final, as may be necessary in order to a final and proper adjustment of the rights of all the parties, preliminary to a sale of the interest of the State in said road. Also to declare the exact amount of indebtedness of each of said companies to the State; and likewise to define, as may be thought proper, what shall be the rights, duties and liabilities of a purchaser of the State's interest in said roads, or either of them, and what shall be the reserved rights of said companies, stockholders, and others, respectively, as against said purchasers after such sale, under the existing laws of the State."

"Sec. 10. That, upon the sale of any of the franchises of either of the railroad companies by the com-

State, ex rel., v. Enloe.

missioners under the provisions of this act, all the rights, privileges and immunities appertaining to the franchise so sold, under its act of incorporation and the amendments thereto, and the general improvement law of the State, and acts amendatory thereof, shall be transferred to and vest in said purchaser, and the purchaser shall hold said franchise subject to all liens and liabilities in favor of the State as now provided by law against the railroad companies."

Another act was passed January 26, 1871, (Acts 1870-71, p. 63, c. 54), providing "that, whenever any person or persons shall hereafter become purchasers of any of the existing railroads on which the State has a lien, or is in any way interested that may be sold under the laws of the State as they are now, or may hereafter be enacted, said person or persons so purchasing may file their petition in the chancery court of either of the counties through which said railroad runs, asking to be substituted to all the rights, privileges and immunities, and subject to all the liabilities of the act of incorporation, under which said railroad company was organized, and amendatory thereof, and for such a change of name or privilege as they may desire; and upon satisfactory evidence being produced of the fact of the purchase and the propriety of the changes proposed, then the chancellor may so adjudicate and decree; and the purchaser or purchasers will be thereby fully clothed with the powers, privileges and immunities of the original act of incorporation, and acts amendatory thereof, and

subject to all the liens and liabilities thereby created
or incurred."

These are the acts referred to in the bill in the present
case, under which the road, with its rights, privileges,
and immunities, was sold and was purchased by John-
son, and under which the Knoxville & Ohio Railroad
Company was organized, under that name.

It does not appear that any attempt was made to
tax the Knoxville & Ohio Railroad Company, or to
question its immunity from taxation under the purchase
which it made under the court proceedings referred to,
until 1877. The history of this effort appears in *Rail-
road* v. *Hicks*, reported in 9 Baxt., at page 442 et seq.
In that year it appears that Anderson county under-
took to collect taxes from the road, which it paid under
protest and then sued to recover. The court held in
that case that under the decree of the chancery court
of Davidson county, under which the purchase was
made, the immunity from taxation passed to the pur-
chaser, and that, the State having provided for the ad-
judication of these questions, and the purchase having
been made on the faith thereof, it could not question
the validity of adjudication. Upon this subject the
court said:

"The bill was accordingly filed, and by decree before
the sale the amount of the State's debt was ascertained
and adjudged, and also that the same was a lien upon
the entire property, rights, privileges, and franchises
of the company; that a sale would transfer all the in-

terest, leaving none in the stockholders or corporation; that a sale of any of the franchises of said company would vest the purchasers with all the rights, privileges, and immunities appertaining to the franchises by the charter and amendment. A sale was made, reported, confirmed, and title vested, as before stated. Without reciting the parts of the various decrees and proceedings bearing upon the question, it is sufficient to say that it is distinctly adjudged that not only the property of the old company, but all its rights, franchises, privileges, and immunities, as defined by the charter and laws and the decrees in the cause, passed to and vested in the new company. We are of the opinion that, the State having expressly provided for the adjudication of all these questions by the tribunal appointed, and the purchase having been made upon the faith thereof, the validity of the adjudication cannot be now questioned by the State."

The matter then rested until the year 1891, when an attempt was made by the State Tax Assessors, having charge of the assessment of railroad properties, to assess the property of this same railroad company for taxation. Thereupon a bill was filed in the circuit court of the United States for the middle district of Tennessee to enjoin such assessment proceedings. The case was decided in that court, and thence appealed to the circuit court of appeals for the sixth circuit, and resulted in a decree enjoining the assessment. See this case reported under the name of *Buchanan* v. *Knoxville & Ohio Railroad Co.,* 71 Fed., 324, 18 C. C. A., 122.

The next effort on the part of the State was to collect a privilege tax on the franchises of the company. The State, through James A. Harris, comptroller of the treasury, demanded of the company privilege taxes for the years 1893, 1894, 1895, and 1896—in all, for $4,820. The company paid the sum demanded under protest and sued to recover it back. This case finally reached this court and is reported under the name of *Railroad* v. *Harris,* 99 Tenn., 684, 43 S. W., 115, 53 L. R. A., 921. It was held in that case that the company was liable to privilege taxation. This case was then carried to the supreme court of the United States by writ of error, and while pending there, undetermined, the legislature of this State, in its general revenue bill (chapter 432, p. 1044, of the Acts of 1899), provided as follows:

"Each railroad company not paying an *ad valorem* tax to this State, and operating or controlling a railroad in this State, for taking up and transporting freight or passengers from one point in this State to another point in this State, shall pay annually a privilege tax, of $120 for each mile of railroad so operated or controlled in this State.

"This tax shall not apply to any railroad exempted by legislative contract of this State from the payment of a privilege tax: Provided, that any railroad company to which the foregoing privilege tax would attach or apply shall be relieved and released from the payment of the same by obligating itself to pay to the comptroller of the State, in lieu of all other taxes, $4,500 annual-

ly for the term of ten years, beginning with the year 1899, and ending January 1, 1909, and which shall agree and contract that thereafter the property and franchises of such railroad or railway company shall be liable and subject to *ad valorem* taxation; and agreeing that any litigation now pending in any of the courts of the State of Tennessee, or of the United States, the purpose of which is to prevent or restrain the enforcement of the collection of privilege taxes on such railroad, or to recover money already paid for such privilege taxes, shall be dismissed at the cost of such railroad company.

"And the governor and comptroller of the State are hereby authorized, empowered, and directed as the representatives of and for, and on behalf of the State, to make and execute a contract according to the terms and provisions hereinbefore set out, with any railroad company, to which the same shall apply, and which shall profess a willingness to enter into such contract. But in the event such a contract is not consummated as herein provided, the privilege tax herein provided for shall remain in full force."

On the 1st day of November, 1899, an agreement was entered into which appears as Exhibit, No. 1, to the bill in this case, between the railroad company and the State, to carry out and effectuate the purposes of the act above quoted; the State being represented, as provided in the act, by Hon. Benton McMillan, then its governor, and by Hon. Theodore F. King, then comptroller of the State.

This contract, after reciting the chartering of the road in its original form, the changes through which it had passed, and the purchase under the chancery court at Nashville pursuant to legislative authority, and the organization under the name of the Knoxville & Ohio Railroad Company, the proceedings in the case of *Railroad Company* v. *Hicks,* and in *Buchanan* v. *Knoxville & Ohio Railroad Company* and *Railroad* v. *Harris,* and that the latter case had been carried to the supreme court of the United States by writ of error on application of the railroad company, and also after reciting the above-mentioned act, and that the contract was entered into pursuant thereto, then continues:

"Now, therefore, this agreement witnesseth: That the railroad company, party of the first part, in consideration of the premises and the covenants on behalf of the State hereinafter contained, hereby covenants and agrees to and with the State as follows:

"(1) That it will forthwith upon demand pay unto the comptroller of the State of Tennessee the sum of $4,500, and thereafter will upon like demand pay annually during each succeeding year for the full term of ten years, beginning with the first payment of 1899, and ending January 1, 1909, a like sum of $4,500, provided that the same shall be accepted by the State in lieu of all other taxes imposed or hereafter to be imposed by the State of Tennessee, or any city, county, or municipality thereof, during said term of ten years, upon the railroad company or any of its property, or

upon the franchises of the railroad company, or for a license or privilege to the railroad company to do business authorized by its charter in the State of Tennessee, or for any other form of taxation which may be at any time thereafter devised.

"(2)  That on and after the 1st day of January, 1909, the property and franchise of the railroad company shall and may be liable and subject to *ad valorem* taxation on the same basis as may be at any time lawfully imposed on other railroad property in the State of Tennessee; the railroad company hereby waiving as of and after the said 1st day of January, 1909, all exemptions as to *ad valorem* taxes contained in its charter.

"(3)  That it will forthwith cause to be dismissed at its own cost any and all litigation now pending in any of the courts of the State of Tennessee, or of the United States, the purpose of which is to prevent or restrain the enforcement or collection of a privilege tax upon it, the railroad company, or to recover money already paid by it, the railroad company, for such privilege taxes to the State of Tennessee."

Referring to the foregoing act of 1899 and the contract based thereon, the bill contains the following allegation:

"By chapter 432, Acts of 1899, the legislature of Tennessee assumed to impose a privilege tax upon the railroad companies in Tennesse which did not pay an *ad valorem* tax to the State.  The Knoxville & Ohio Railroad Company assumed and pretended, and by its fraud-

ulent misrepresentation and concealment of the facts, all as hereinafter will be shown, led the State officials to believe, that it came within such class and designation, and accordingly it paid such privilege tax as assessed, and after paying said tax in accordance with the provisions of said legislative enactment, brought suit in the chancery court of Knox county, Tennessee, against the State comptroller of the treasury to recover the same, basing its contention upon the amendment to the charter of the Knoxville & Kentucky Railroad Company hereinabove set forth and an alleged charter exemption from all taxation at all times by virtue thereof. After the supreme court of Tennessee, in considering said case upon appeal (said case being reported under the style of *Railroad* v. *Harris*, 99 Tenn., 684, 43 S. W., 115, 53 L. R. A., 921) held said privilege tax legal, and said case had been transferred by writ of error to the supreme court of the United States, the State of Tennessee assumed, in violation of section 28, art. 2, and section 8, art. 11, of the constitution of Tennessee of 1870, to enter into a contract with said Knoxville & Ohio Railroad Company by and under which, upon the payment by said railroad company to the State of Tennessee of the sum of $4,500 annually for ten years, in lieu of all other privileges and *ad valorem* taxes, said railroad company was to be for all time relieved of the payment of any and all privilege taxes which might at any time be assessed against said property or company by the State or any municipality or county thereof,

but should at the end of ten years be subject to an *ad valorem* taxation for the benefit of the State of Tennessee and its constituent counties and cities through which said line of road passes. A true copy of said agreement thus assumed to be entered into is herewith filed as Exhibit 1, and is prayed to be taken as part hereof as fully as though herein copied, but it need not be copied in issuing process. Petitioners will insist that said contract is null, void, and unconstitutional, as assuming to create an exemption not theretofore existing, in violation of the constitution of Tennessee. Petitioners will further insist that said agreement is null, void, and unconstitutional, as assuming to contract away the rights of said counties of Anderson, Campbell, and Knox, and the municipalities thereof through which said road passes, without the consent of or any consideration to said counties and municipalities.

"Petitioners further show unto the court that said agreement and effort to create a contractual right of exemption from taxation in favor of said Knoxville & Ohio Railroad is unconstitutional, void, illegal, and not of force and effect for these further reasons: As hereinbefore briefly stated, it was assumed by both that said Knoxville & Ohio Railroad Company was not and could not be required to pay an *ad valorem* tax to the State of Tennessee and that it came within the terms and provisions of said act of 1899, imposing a privilege tax; whereas, as a matter of fact, it was the precise and

specific provision of said amendment to the charter of
the Knoxville & Kentucky Railroad Company thus re-
lied upon, and as hereinbefore quoted, that said exemp-
tion from taxation should only continue until and no
longer than said railroad company should earn net
revenues and profits in excess of six per cent. upon its
capital stock. In fact said company had for many years
theretofore, as petitioner is informed and thereupon
avers, earned net revenues and profits yearly far in ex-
cess of six per cent. or the legal rate of interest in Ten-
nessee, upon its capital stock, and had earned net reve-
nues and profits of such an amount as that the fund
available with which to pay dividends upon said stock
would still, after the payment of *ad valorem* taxes upon
said property at a proper valuation at the same rate
of taxation as that paid by other railroads, exceed the
amount of six per cent. upon said capital stock. In
addition to this, as petitioner is informed and thereupon
avers, said Knoxville & Ohio Railroad Company, for
the purpose of fraudulently concealing its true condi-
tion and earnings, and of preventing, if possible, the
incurring of an obligation upon its part to pay an *ad
valorem* tax upon its property, and of at least conceal-
ing such obligations, entered upon its books numerous
and sundry charges which would appear to be charges
against the revenue of said road, but which were not
proper to be so entered or charged, but were in fact in-
curred, if at all, for the sole benefit, use, and profit of the
Southern Railway Company, which was assuming to

operate said Knoxville & Ohio property. All of these facts were carefully concealed from, and, as petitioner is informed and thereupon avers, misrepresented to, the State of Tennessee and its officials, and to the board of railroad commissioners and of State assessors of railroad taxes for Tennessee. And petitioner further avers that it was alone because of and as a result of such fraudulent concealments the legislature was induced to go through the form of entering into said contract. Exhibit 1, hereinbefore referred to. And petitioner specifically avers that at and prior to the time of making said contract said Knoxville & Ohio Railroad Company did not come in fact within the provisions of said act of 1899, and was not one of the railroad companies of the State of Tennessee which did not or should not at that time pay an *ad valorem* tax to the State of Tennessee, and for this reason said contract is illegal, void, and unenforceable."

Further upon the same subject it is alleged in the bill:

"That the amendment to the charter of the Knoxville & Kentucky Railroad above cited and quoted, which, as petitioner is informed, is relied upon as creating a charter exemption from taxation in favor of the Knoxville & Ohio Railroad Company, and the Southern Railroad Company, the present alleged owner of said railroad property [it being alleged in the bill that the Southern Rail-

121 Tenn—24

way Company bought the property in 1903], pro-
vides specifically that 'the stock or dividends, when the
said dividends shall exceed the legal interest of the
State, may be subject to taxation by the State in com-
mon with and at the same rate as money at interest; but
no tax shall be imposed so as to reduce the part of the
dividend to be received by the stockholders, below the
legal interest of the State.' The relators and petitioners
have been credibly informed, and thereupon aver, that
at the time said Knoxville & Ohio Railroad Company
assumed to sell to the Southern Railway Company said
railroad property, as shown by the said deed, Exhibit
2, said Knoxville & Ohio Railroad Company had out-
standing capital stock to the amount of $1,122,200, and
that the net earnings of said line of railroad over and
above all operating expenses and charges that were
actually or could have been or could be ordered against
the same, exceeded the sum of six per cent. (the legal
rate of interest in Tennessee) upon said capital stock,
and would for the year 1899 and each subsequent year,
and will so exceed for the years 1906 and 1907 and
1908, said six per cent. on said capital stock by $100,-
000 or more yearly."

It is further alleged:

"That it was the specific contemplation and require-
ment set forth in said amendment to the charter of the
Knoxville & Kentucky Railroad Company quoted that
when the net revenue of said railroad property should
yield a sum sufficient to pay six per cent., the legal rate

of interest, on said capital stock, said capital stock itself should be assessed for taxation and taxes thereon should be paid by said railway company. Petitioner again avers that ever since prior to 1899, down to and including the years 1906 and 1907, the net revenues of said road have yearly exceeded said sum. Accordingly petitioners show unto the court and will insist that the capital stock of said Knoxville & Ohio Railroad Company, to wit, $1,122,200, be subject to assessment by the defendant board of tax assessors, and to taxation for the benefit of the State of Tennessee and said counties of Anderson, Campbell, and Knox; that not only is this amount of capital stock or capitalization of said railroad subject to assessment, and that taxes must be paid thereon by said railroad company, but, further, that whatever force or validity there may originally have been in said charter amendment to relieve the original owner of said property from the payment of taxes until the earnings should reach said sum, since said road had earned and is earning a sum in excess of six per cent. upon its capital stock, and said railroad property itself, and the surplus of net earnings therefrom, as well as the capital stock, are each and all subject to assessment for the payment of taxes; and it is the duty of defendants, which defendants are refusing to perform, to assess said railroad property, surplus, and capital stock for such taxation purposes."

It is further alleged, "upon information and belief":

"That the Southern Railway Company, which is oper-

ating said Knoxville & Ohio Railroad property, has assumed to handle over said line of road, for the benefit of its other lines, many train loads of coal and other material. All of the expenses of handling these supplies' known as 'company material,' have, as petitioner is informed, and thereupon avers, been paid by and charged against said Knoxville & Ohio Road or division; but. notwithstanding the fact that it has not had the use of such material, and in all equity is entitled to compensation at the regular rates for the handling of such coal and other material, no allowance or .payment therefor has been made to it. The sum which thus [should] be passed to the credit of said property and line of road would amount, as petitioner is credibly informed, and thereupon avers, to upwards of $100,000 yearly; and petitioner will insist that, for the purpose, at least, of ascertaining the net revenues of said line of road, and of determining whether or not its net revenue, out of which dividends could and should be paid upon its stock exceeded the legal interest of the State, this line of road should receive compensation for all work done by it, as well that done for other property of the Southern Railway Company as that which was done for the outside public."

It was alleged that these matters had been brought to the attention of the board of railroad commissioners, sitting as a board of State tax assessors, and they had been requested to assess the property of the railway company for taxation for the years 1907 and 1908, and

to back assess for the preceding years, but that they had refused to grant this prayer.    There is exhibited with the bill a copy of the entry made by the State board of railroad commissioners, setting forth their reasons for the refusal.    The substance of this entry is that the matter had been laid before the attorney-general of the State, Hon. Charles T. Cates, Jr., and that he had submitted to the board his opinion advising against the action sought, on the ground that it was contrary to the interests of the State to reopen the controversy between the State and the railway company which had been settled by the compromise agreement, Exhibit 1 to the bill.    The entry indicates that the members of the board sanctioned, as sound and just, the conclusion reached by the attorney-general and recommended to them.

On the refusal of the board to entertain the complaint of the counties, they prayed an appeal to the board of equalization, composed of the governor, treasurer, and secretary of state.    This appeal was denied, on the ground that the law did not provide for or authorize any appeal upon the refusal of the board of railroad commissioners to assess property; the duty of the board of equalization being merely to examine assessments made by the board of railway commissioners, acting as a State board of assessors, and to increase or diminish the valuation placed upon any property valued by the assessors, and to require of the assessors any additional evidence touching properties assessed.

After the appeal last mentioned was refused, the present bill was filed, as alleged therein, to compel the State board of railway commissioners to make the assessment, and to that end the writ of *mandamus* was applied for.

Several grounds of demurrer were filed, both by the State board of railway commissioners and the Southern Railway Company. As already stated, the demurrers were sustained in the court below.

We deem it necessary to refer to only one of the grounds of demurrer—this, in substance, that the bill does not state a case which would justify the court in granting the writ of *mandamus*.

Before stating our conclusions upon this matter, it is proper that we should pause to consider the attitude of the parties.

On the one hand, we find the board of railway commissioners, in their capacity of State tax assessors, representing the whole State, supported and advised by the attorney-general of the State, likewise standing for the whole State, and both insisting upon preserving the *status* which was attained ten years ago by the State, represented by the general assembly acting for it, and the governor and the comptroller acting in obedience to the legislature. We find that this *status* was reached after years of litigation between the State and the railway company; that in two of these suits the State had sustained a decisive defeat as to *ad valorem* taxation, and that the third litigation embracing privilege taxa-

tion was suspended by writ of error, and pended undetermined, in the supreme court of the United States. On the other hand, we find three counties of the State insisting that the adjustment reached by the State and the railway company was all wrong and should be disregarded, and in effect that this should be done regardless of the consequences that might ensue to the State and the counties themselves hereafter.

We shall be better able to determine the course that should be pursued by this court in the use of its discretionary power to grant or withhold the writ, according to the public interest, when we shall have suggested some of the questions that must be considered and the position in which the State may be placed.

In the first place, the action sought involves a repudiation and annulment, or attempted annulment, of the contract entered into between the State and the railway company. This action would be certain to involve the State in expensive litigation with the railway company. Treating the agreement as annulled, the railway company would have the right to reassert its claim to exemptions to the full limit of its charter, and would start into that litigation with the advantage of two decisions upon the subject of *ad valorem* taxation in its favor; one a decision of this court reported in 9 Baxt., 442, above referred to, and the other a decision of the circuit court of appeals of the United States for the sixth circuit, reported in 71 Fed., 324, 18 C. C. A., 122, likewise above referred to. To meet this initial

advantage the State might contend, as insisted by counsel for complainants in the present case, that the exemptions were lost or forfeited by the sale of the property to the Southern Railway Company; the ground of this contention being that exemptions are a personal privilege and not transferable. In response to this however, the State would be compelled to face the inquiry whether, under the legislative acts of 1870 and 1871, above referred to, and the chancery proceedings had thereunder, the immunities had not been sold as incidents to the property, and thus made transmissible, as seems to have been held in 9 Baxt., 442. Inquiry would likewise arise whether the railway company, having bought on the faith of that decision, would or would not be entitled to claim an estoppel against the State. The difficulty of overruling such a decision in this class of cases, as to the particular property involved, even if the decision should subsequently be deemed erroneous, is illustrated in the case of *State, ex rel.*, v. *Whitworth*, 8 Lea, 594, 606, et seq. Other cases that seem to be in line with *Railroad* v. *Hicks*, 9 Baxt., 442, are *State* v. *Railroad*, 12 Lea, 583; *State* v. *Butler*, 15 Lea, 104, 112; *State* v. *Railroad Company*, 86 Tenn., 438, 6 S. W., 880. The existence of these cases would increase the difficulty.

Treating the controversy, then, as reopened, and assuming that the decisions above referred to would stand as obstacles before the State on its road to relief—whether movable or immovable we need not consider—

there would be still left to the State, as contended by counsel for complainant, the inquiry into the earnings of the road one year with another. The bill charges that these earnings exceeded six per cent. The inquiry, however, would not stop with that fact. The question would arise whether the court could compel the company to declare a dividend on its stock, in order that the State might tax the stock, or whether the railway company would have the right to manage the road for the benefit of its stockholders and apply the surplus earnings to betterments, or to the creation of a sinking fund to take up in time the two mortgages referred to in Exhibit 2 to the bill. It is to be observed that the bill does not charge that a dividend had been declared, but simply that more than six per cent. during certain years had been earned. But, passing beyond this, even if the position of complainant's counsel could be held sound in the very best view of the matter, the State would be involved constantly in litigation with the railway company to ascertain its earnings, year by year, and to compel their application to dividends in order that taxes might be assessed.

If every contention above referred to that might be advanced by the State in the supposed litigation ensuing upon an annulment of the contract of 1899 should be lost by the State, there would still remain to it the right to assess privilege taxes. Suppose the railway company should refuse to pay such taxes, could the judgment in *Railroad Company* v. *Harris,* supra, be

treated as *res adjudicata* in a subsequent case involving
taxes for another year?  The rule in this State is that
the plea of *res adjudicata* in tax cases is to be limited
to the taxes actually in litigation, and that the judgment
is not conclusive in respect of taxes assessed for other
and subsequent years.  *Bank* v. *Memphis,* 101 Tenn.,
154, 167, 46 S. W., 557.  Although the rule of *stare
decisis* would undoubtedly not apply, it is not clear that
this would prevent the suing out of a writ of error to the
supreme court of the United States to test the matter
in that tribunal.

So it seems the legitimate effect of granting the *man-
damus* prayed for in the present case would be to de-
prive the State of the great benefit it obtained in induc-
ing the railway company to waive its exemptions and to
go upon the tax list as other railway companies on
January 1, 1909, and of the $4,500 paid yearly by the
railway company between the years 1899 and 1909.  We
mention the latter feature, because the State would be
bound in honor to refund the sums received under a
repudiated contract; but, if it did not willingly make
this return, it would have to account for such sums as
credits upon any taxes which it might be able to recover
by litigation.  Another effect, as the court judicially
knows, would be to open up a similar and a much larger
controversy with another railroad company, that settled
its litigation over its exemptions with the State by an
agreement to pay yearly a certain sum up to a date fix-
ed, and then to go upon the tax list as other railroad

State, ex rel., v. Enloe.

companies. In exchange for these great losses, the State would obtain, under the bill, simply the right to institute and maintain many lawsuits against railway companies, all of which might prove fruitless—an exchange of useful and enduring benefits for useless and galling burdens.

Should the three complaining counties be permitted to force the State into this position? We think not. It is insisted, however, that the State is really a party to the present controversy, because the attorney-general for Davidson county consented that the name of the State might be used on the relation of the counties. The use of the State's name was altogether unnecessary. The counties might have sued in their own name. Moreover, the real parties complainant in the controversy are the counties. The appearance of the State in such a case is merely nominal. There is no statute authorizing the use of the State's name in such a litigation for the use of the counties. The right claimed does not fall under section 495 of Shannon's Code, which regulates suits in the name of the State for the counties; nor does it fall within sections 5165 to 5187, inclusive, which regulate proceedings in the name of the State against corporations and to prevent the usurpation of office. When the State is to be bound by proceedings to collect taxes by suits at law or in equity, or other debts due the State, it must appear by the attorney-general of the State. Shannon's Code, sec. 5756, subsec. 5. See, also, section 6105. However, if

the present suit had been instituted by the attorney-general himself, the result would have to be the same.

In a former part of this opinion we called attention to the rule requiring this court, on overruling a demurrer to a bill for *mandamus*, to inspect the answers submitted, with a view to deciding whether they presented any such contention as would justify us in withholding the issuance of a peremptory writ. Inasmuch as we sustain the demurrer, we deem it unnecessary to refer to the answers further than to say that they show that the State would have to encounter all of the difficulties above indicated.

On the grounds stated, we are of the opinion that the judgment of the court below sustaining the demurrer must be affirmed, and the bill dismissed, with costs.